*171 KISTLER, J.
The question that this case presents is whether a statute limiting a state employee’s tort liability violates either the remedy clause of Article I, section 10, of the Oregon Constitution or the jury trial clauses of Article I, section 17, and Article VII (Amended), section 3, of the Oregon Constitution. The trial court held that the statute, as applied to the state employee, violated each of those provisions and entered a limited judgment against the employee for the full amount of the jury’s verdict. On direct appeal, we reverse the trial court’s limited judgment and remand this case to the trial court for entry of a judgment consistent with this decision.
Plaintiffs six-month-old son developed a cancerous mass on his liver. Two doctors at Oregon Health & Science University (OHSU) participated in an operation to remove the mass: Dr. Harrison, a specialist in pediatric surgery, and Dr. Durant, a pediatric surgical fellow in training. During the operation, the doctors inadvertently transected blood vessels going to the child’s liver. That act has resulted in the child having to undergo a liver transplant, removal of his spleen, additional surgeries, and lifetime monitoring due to the risks resulting from the doctors’ act.
Plaintiff brought this action on her son’s behalf against Harrison, Durant, OHSU, and Pediatric Surgical Associates, PC. The trial court granted Pediatric Surgical Associates’ motion for summary judgment, and it dismissed Durant as a result of an agreement among plaintiff, OHSU, and Harrison. Pursuant to that agreement, Harrison and OHSU admitted liability for the child’s injuries and plaintiffs case against Harrison and OHSU went to the jury to determine the amount of the child’s damages. The jury found that plaintiffs son had sustained and will sustain economic damages of $6,071,190.38 and noneconomic damages of $6,000,000.
After the jury returned its verdict, OHSU and Harrison filed a motion to reduce the jury’s verdict to $3,000,000 based on the Oregon Tort Claims Act. The trial court granted the motion as to OHSU. It ruled that, because sovereign immunity applies to OHSU, the legislature *172 constitutionally may limit the damages for which OHSU is liable. See Clarke v. OHSU, 343 Or 581, 600, 175 P3d 418 (2007) (so holding). The trial court, however, denied the motion as to Harrison. Harrison had argued that, in 1857, he would have been entitled to discretionary immunity for errors occurring during surgery. It followed, he reasoned, that, because he would not have been liable for any damages in 1857 for his negligence, the Tort Claims Act limit may be applied constitutionally to him. The trial court disagreed with that argument. It then ruled that the Tort Claims Act limit, as applied to Harrison, violated the remedy clause of Article I, section 10, and the jury trial clauses of Article I, section 17, and Article VII (Amended), section 3. The court accordingly entered a limited judgment against Harrison for all the damages that the jury had awarded.
Harrison (defendant) filed a direct appeal to this court from the limited judgment. See ORS 30.274(3) (providing for direct appeals to this court from limited judgments arising from application of tort claims limitations).[1] On appeal, he assigns error to the trial court’s post-verdict ruling denying his motion to limit the jury’s verdict against him pursuant to the Tort Claims Act. He raises three arguments in support of that assignment. Initially, he reasserts the discretionary immunity argument that the trial court rejected. Alternatively, he asks us to reexamine our cases interpreting the remedy clause and the jury trial clauses. He raises separate arguments regarding each clause, but essentially he contends that our cases interpreting those clauses rest on a faulty understanding of history, are inconsistent with later cases, and should be overruled.
Having considered defendant’s discretionary immunity argument, we agree with the trial court’s ruling on that issue. Explaining why we agree would be of little value to anyone other than the parties. We accordingly uphold the trial court’s ruling on that issue without further discussion and turn to the question whether the limit that the Tort Claims Act places on a state employee’s damages violates *173 either the remedy clause of Article I, section 10, or the jury trial clauses of Article I, section 17, and Article VII (Amended), section 3.
As explained below, we conclude that the right to a remedy protected by Article I, section 10, and the right to a jury trial protected by Article I, section 17, address related but separate issues. Article I, section 10, limits the legislature’s substantive authority to alter or adjust a person’s remedy for injuries to person, property, and reputation. Article I, section 17, guarantees a jury trial in those classes of cases in which the right to a jury trial was customary at the time the Oregon Constitution was adopted and in cases of like nature. However, Article I, section 17, places no additional substantive limit on the legislature’s authority to alter or adjust remedies beyond that found in Article I, section 10. Accordingly, we begin with the question whether the Tort Claims Act limit violates the remedy clause of Article I, section 10.
I. ARTICLE I, SECTION 10
The Tort Claims Act both waives the state’s sovereign immunity and, as applicable here, limits the tort liability of the state and its employees to $3,000,000. ORS 30.265(1); ORS 30.271(3)(a).[2] The act imposes, as a matter of Oregon law, a legal limit on the amount of damages that a plaintiff may recover against the state and its employees. Following Smothers v. Gresham Transfer, Inc., 332 Or 83, 23 P3d 333 (2001), the trial court ruled that, as applied to defendant, the Tort Claims Act limit violated the remedy clause of Article I, section 10.[3] On appeal, defendant argues that we should overrule Smothers, as well as our other remedy clause cases, and hold that Article I, section 10, is not “a substantive guarantee of a remedy * * * [but] rather, guarantees access to the courts [only] for such remedies as the law may provide.” Defendant and his amici argue that Smothers *174 based its holding on an incomplete view of the historical circumstances surrounding Oregon’s remedy clause and drew inferences that even its doubtful premises cannot support. See generally Jonathan M. Hoffman, Questions Before Answers: The Ongoing Search to Understand the Origins of the Open Courts Clause, 32 Rutgers LJ 1005 (2001) (detailing some of the historical assumptions in Smothers that may have been faulty); see also Klutschkowski v. PeaceHealth, 354 Or 150, 178-96, 311 P3d 461 (2013) (Landau, J., concurring) (describing problems with the historical analysis in Smothers). Alternatively, defendant argues that, even if Smothers is good law, the damages available under the Tort Claims Act are “substantial” and thus constitutional. See Howell v. Boyle, 353 Or 359, 298 P3d 1 (2013).
Plaintiff responds that Smothers “was a correct interpretation of the remedy clause,” although she does not question the history on which defendant relies. Plaintiff relies instead on an earlier line of this court’s cases interpreting the remedy clause, which consistently have held that the remedy clause imposes a substantive limit on the legislature’s authority to alter or adjust remedies for certain kinds of injuries. As plaintiff interprets Smothers, that decision did not tie the protections of the remedy clause to Oregon common law as it existed in 1857. Rather, plaintiff contends that Smothers requires a remedy that “‘either restores the status quo or compensates the injured party for the loss.’” (Quoting Holden v. Pioneer Broadcasting Co., 228 Or 405, 365 P2d 845 (1961) (Goodwin, J., dissenting), cert den, 370 US 157 (1962).)
Plaintiffs argument appears to rest on the proposition that the legislature may not limit either the nature or extent of common-law remedies but that it may extend those remedies to new subjects, expand the scope of available damages, and abrogate common-law defenses. In plaintiffs view, this court’s decisions in Howell and Lawson v. Hoke, 339 Or 253, 119 P3d 210 (2005), departed from a correct understanding of the remedy clause because Howell and Lawson (but not Smothers) “‘froz[e] common law’ by reducing the protections of Article I, section 10 to the claims that might have been successfully litigated in 1857.”
*175 As we understand the parties’ arguments, they agree that the remedy clause should not be tied strictly to Oregon common law as it existed in 1857. They disagree, however, whether the remedy clause places any substantive limit on the legislature’s authority. It follows that the parties’ arguments present two related but separate issues. The first is whether Smothers tied the meaning of the remedy clause to Oregon common law as it existed in 1857 and, if it did, whether it erred in doing so. The second is whether our other remedy clause cases erred in holding that the remedy clause places a substantive limit on the legislature’s ability to modify remedies. In considering those issues, we first describe our decision in Smothers. We then explain why we conclude that Smothers clearly erred in tying the remedy clause to the common law in 1857 and should be overruled. We next explain why we disagree with defendant that we should overrule our other cases holding that the remedy clause places a substantive limit on legislative authority. Finally, we explain why the limitation on damages against state employees does not violate the remedy clause.
A. Smothers
In Smothers, the court stated that our cases interpreting the remedy clause have not been consistent, and it sought to provide a definitive interpretation of that clause. 332 Or at 90. Using the methodology set out in Priest v. Pearce, 314 Or 411, 415-16, 840 P2d 65 (1992), the court considered the text of Article I, section 10, its history, and our cases interpreting the remedy clause. Smothers, 332 Or at 91-123. After surveying Magna Carta, Coke’s Second Institute, Blackstone’s Commentaries, and decisions from other states interpreting their remedy clauses, Smothers concluded that the historical purpose of the remedy clause was “to mandate the availability of a remedy by due course of law for injury to absolute rights respecting person, property, and reputation.” Id. at 114.
Smothers explained that, to give effect to that purpose, Oregon courts should ask two questions. The first is “whether the plaintiff has alleged an injury to one of the absolute rights that Article I, section 10 protects.” Id. at 124. *176 Because Smothers concluded that an “injury,” as that term is used in the remedy clause, is a “wrong or harm for which a cause of action existed when the drafters wrote the Oregon Constitution in 1857,” it restated the first question as follows: “[W]hen the drafters wrote the Oregon Constitution in 1857, did the common law of Oregon recognize a cause of action for the alleged injury?” Id.
Smothers stated that, if the answer to that question is “yes,” then the remedy clause mandates that a constitutionally adequate remedy for that injury be available. Id. The court observed that “[a] common-law cause of action is a constitutionally adequate remedy for seeking redress for injury to protected rights.” Id. Smothers also recognized, however, that the remedy clause “does not freeze in place common-law causes of action that existed when the drafters wrote the Oregon Constitution in 1857.” Id. The legislature may modify or abolish a common-law remedy “so long as it provides a substitute remedial process” for injuries to “absolute rights that the remedy clause protects.” Id. Because the legislature may provide a substitute remedial process for common-law injuries to absolute rights, the court formulated a second question to implement the remedy clause: If the legislature has abolished a common-law cause of action for protected injuries, has the legislature “provided a constitutionally adequate substitute remedy for the common-law cause of action for that injury?” Id.
Applying that framework to the claim in Smothers, the court explained that, in 1857, the plaintiff in Smothers would have had a cause of action against his employer for negligently exposing him to dangerous fumes that were “a contributing cause” of his injuries. Id. at 129-33. The legislature, however, made workers’ compensation the plaintiffs exclusive remedy, and it required that the plaintiff prove that his employer’s negligence was “the major contributing cause” of his injury to recover under workers’ compensation. Id. at 133. Because the plaintiff could not make that showing, Smothers held that the workers’ compensation statute, as applied, violated the remedy clause; that is, the workers’ compensation statute violated the remedy clause because it denied the plaintiff any remedy for an injury—bodily harm *177 for which the defendant’s negligence was a contributing cause—that would have been actionable under the common law of Oregon in 1857. Id. at 133-36.
Smothers did not reach the question of when a modified remedy for an injury that was actionable in 1857 will be “constitutionally adequate.” Id. at 120 n 19. The court explained:
“[T]he only question in this case is whether the legislature has deprived plaintiff of a means for seeking redress for the injury [that was recognized at common law in 1857 and] that he alleges that he suffered at work. Accordingly, it is beyond the scope of this opinion to address issues relating to the adequacy of the amount of damages that may be available under a legislatively substituted process for a common-law cause of action for injury to one of the rights that is protected by the remedy clause.”
Id. (emphasis in original). The court noted that other cases had stated that a remedy will be constitutionally adequate if it is “substantial.” Id. For instance, in Hale, this court concluded that, in determining the adequacy of a remedy, “the remedy need not be precisely of the same type or extent; it is enough that the remedy is a substantial one.” Hale v. Port of Portland, 308 Or 508, 523, 783 P2d 506 (1989). See also Neher v. Chartier, 319 Or 417, 426, 879 P2d 156 (1994) (citing rule from Hale)', Greist v. Phillips, 322 Or 281, 291, 906 P2d 789 (1995) (same).
As we read Smothers, it tied the meaning of the remedy clause to Oregon common law in 1857 in two ways. First, if the common law of Oregon provided a cause of action for an injury to person, property, or reputation in 1857, then the law must continue to provide some remedy for that historically defined injury. Not only did Smothers say so explicitly, but it held the workers’ compensation statute unconstitutional, as applied, because an actionable injury under that statute (bodily harm for which the employer’s negligence was the major contributing cause) was different from and narrower than the injury for which a cause of action existed in 1857 (bodily harm for which the employer’s negligence was a contributing cause). See Smothers, 332 Or at 124, *178 133-36. Second, in determining whether the law provides a constitutionally adequate remedy, the court looked to the common law in 1857 as a model. It noted that common-law remedies for historically defined injuries would be constitutionally adequate but that the remedy clause does not prevent the legislature from modifying a remedy for those injuries as long as the remedy remains a substantial one. Id. at 124.
We accordingly disagree with plaintiff that Smothers did not tie the remedy clause to the common law as it existed in 1857. We also disagree with plaintiff that the court departed from Smothers in Howell and Lawson by looking to the common law in 1857 to determine whether the plaintiffs in those cases had suffered a constitutionally protected injury and whether, if they had, the legislature had provided a constitutionally adequate remedy. We agree, however, with both plaintiff and defendant that tying the remedy clause to the common law in 1857 can produce (and has produced) anomalous results. As others have noted, the common law often turned on a patchwork of confusing and unworkable distinctions. See Edwin M. Borchard, Government Liability in Tort, 34 Yale LJ 229, 233 (1925) (discussing confusion engendered by common-law distinctions). The standard that Smothers announced gives constitutional effect to those common-law anomalies. Moreover, as the dissent recognized in Howell and the majority did not dispute, strict adherence to Smothers can result in the further anomaly of trying two claims to a jury—one under the current law and the other under the law as it existed in 1857. Finally, defendant has raised substantial questions regarding Smothers’ interpretation of the sources on which it relied.
In those circumstances, we conclude that it is appropriate to consider whether Smothers was correctly decided by reexamining the text of Article I, section 10, its history, and our cases. See State v. Reinke, 354 Or 98, 105, 309 P3d 1059, adh’d to as modified on recons, 354 Or 570, 316 P3d 286 (2013) (undertaking similar reexamination). In doing so, we focus initially (and solely) on Smothers' holding that Oregon common law in 1857 defines the injuries for which the law must provide a remedy. Because we overrule *179 Smothers, we also consider the related issue that defendant raises—whether our other remedy clause cases should be overruled as well.
B. The remedy clause and Oregon common law
Article I, section 10, provides:
“No court shall be secret, but justice shall be administered, openly and without purchase, completely and without delay, and every man shall have remedy by due course of law for injury done him in his person, property, or reputation.”
Textually, Article I, section 10, differs from other sections included in Oregon’s bill of rights. It is not a protection against the exercise of governmental power. State ex rel Oregonian Pub. Co. v. Deiz, 289 Or 277, 288, 613 P2d 23 (1980) (Linde, J., concurring). Rather, “ [i]t is one of those provisions of the constitution that prescribe how the functions of government shall be conducted.”[4] Id. Specifically, “ [s]ection 10 as a whole is plainly concerned with the administration of justice.” Hans A. Linde, Without “Due Process”: Unconstitutional Law in Oregon, 49 Or L Rev 125, 136 (1970). Each of the three independent clauses that comprise Article I, section 10, addresses that topic.[5]
The first independent clause prohibits secret courts while the second provides that justice shall be administered “openly and without purchase, completely and without delay.” The third independent- clause provides that “every man shall have remedy by due course of law for injury done him in his person, property, or reputation.” Textually, the third independent clause can be read in two ways. On the one hand, the clause can be seen as a guarantee that courts will provide “every” person a “remedy by due course of law” for *180 certain kinds of injuries. As Professor Linde observed, the clause could be nothing “more than a procedural guarantee that the ‘due course of law’ will be open to ‘every man’ who is entitled to a remedy under the substantive law, whatever that might be at any time.” Linde, Without “Due Process,” 49 Or L Rev at 136.
On the other hand, characterizing the remedy clause solely as a guarantee of equal access to the courts fails to account for all the clause’s text. The text provides that “every man shall have remedy by due course of law for injury done him in his person, property, or reputation.” Focusing on the phrase “by due course of law” can obscure the remainder of the text, which provides that, when a person has had “injury done him in his person, property, or reputation,” he “shall have remedy.” The text is as much about the availability of a remedy as it is about the “due course of law” by which the remedy is to be administered. In a related vein, this court had held that the remedy clause does not apply to every injury a person sustains to a legally protected interest. Juarez v. Windsor Rock Products, Inc., 341 Or 160, 173, 144 P3d 211 (2006) (loss of deceased’s society, guidance, and emotional support did not constitute injury to person, property, or reputation within meaning of remedy clause). Rather, the clause applies only to remedies for three specified types of injuries. Id. The clause’s focus on providing remedies for specified types of injuries implies that it was intended to guarantee some remedy for those injuries, and not merely be a guarantee of procedural regularity for whatever injuries may, at the moment, enjoy legal protection.
To the extent that the text guarantees that some remedy will be available for injuries done to persons in their person, property, and reputation, the question that the text leaves unanswered is what the content of that remedy is. Certainly, nothing in the text of the remedy clause says that its protections are limited to the common law as it existed at a particular point in time. The clause lacks words used elsewhere in the constitution that connect a constitutional guarantee to a single point in time. Compare Or Const, Art VII, § 3 (“thereafter”); Or Const, Art I, § 31 (1857) (“hereafter”); Or Const, Art IV, § 24 (“at the time of the adoption of this constitution”).
*181 Not only does the text of the remedy clause not provide express support for the historical limitation that Smothers perceived, but the context of the remedy clause is also at odds with that limitation. Both Article I, section 10, and Article XVIII, section 7, were adopted as part of the original Oregon Constitution. The Oregon Constitution and Proceedings and Debates of the Constitutional Convention of 1857 402, 431 (Charles Henry Carey ed., 1926). Article XVIII, section 7, provides that “[a]ll laws in force in the Territory of Oregon when this Constitution takes effect, and consistent therewith, shall continue in force until altered, or repealed.”
As this court explained in Land Bd. v. Corvallis Sand & Gravel, 283 Or 147, 156, 582 P2d 1352 (1978), Article XVIII, section 7, “continued in force the substantive principles of the common law which were adopted by the provisional government and sanctioned by the federal act establishing the territorial government.” However, “[t]he common law, as it existed in England at the time of the settlement of the American colonies, has never been in force in all of its provisions in any colony or state of the United States.” Peery v. Fletcher, 93 Or 43, 52, 183 P 143 (1919). Rather, “ [i] t has been adopted so far only as its general principles were suited to the habits and conditions of the colonies, and in harmony with the genius, spirit and objects of American institutions.” Id. Oregon accordingly departed from the “old common law [rule]” that defendants would be liable in trespass for damages caused by their cattle straying onto another person’s land. Perozzi v. Ganiere, 149 Or 330, 348, 40 P2d 1009 (1935). Similarly, in the arid west, the common-law riparian right of property owners to use water appurtenant to their land gave way to a more limited property right to use water based on a system of prior appropriation. Re Water Rights of Hood River, 114 Or 112, 166-81, 227 P 1065 (1924), cert dismissed sub nom Pac. Power & Light Co. v. Bayer, 273 US 647, 47 S Ct 245, 71 L Ed 821 (1926).
In modifying common-law rights to meet conditions unique to this state, Oregon continued a process that began when the original colonies first adopted and then modified English common law. As one author has explained, “[b]y *182 1820 the legal landscape in America bore only the faintest resemblance to what existed forty years earlier” when the original colonies first adopted English common law. Morton J. Horwitz, The Transformation of American Law, 1780-1860 at 30 (1977). As Horwitz describes, from 1780 to 1860, state legislatures modified property and other common-law rights to accommodate both the differing conditions in this country and the industrial growth that the country was experiencing. It follows that, when the framers drafted Oregon’s constitution in 1857, they would not have viewed the common law as static or unchanging—a proposition that is apparent from Article XVIII, section 7, which both continued the common law, as modified to meet Oregon’s needs, and recognized that the common law remained subject to change. See Peery, 93 Or at 52-53 (recognizing that common law can be “altered” or “repealed”).
Consistent with that recognition, the common law has continued to evolve as the premises on which it rests have changed. See Buckler v. Oregon Corrections Div., 316 Or 499, 518, 853 P2d 798 (1993) (Peterson, J., concurring) (explaining that the “beauty and strength of the common-law system is its infinite adaptability to societal change”). For example, this court has held that the common-law doctrine of interspousal immunity no longer bars negligence actions by one spouse against another, Heino v. Harper, 306 Or 347, 374-76, 759 P2d 253 (1988), and it has rejected the doctrine of parental immunity, Winn v. Gilroy, 296 Or 718, 733-34, 681 P2d 776 (1984). In 1975, the legislature abolished the common-law torts of criminal conversation and alienation of affections because those “actions for invasion of the family relationship were considered outmoded by changing views of marriage, divorce, and sexual relations, as reflected in the repeal in 1971 of criminal laws against adultery and enactment of no-fault divorce laws.” Norwest v. Presbyterian Intercommunity Hosp., 293 Or 543, 563, 652 P2d 318 (1982). More recently, we explained that, in light of legislative changes to joint defendants’ liability, “common-law indemnity” is no longer “necessary or justified” for civil claims that are subject to the comparative fault statute. Eclectic Investment, LLC v. Patterson, 357 Or 25, 38, 346 P3d 468 (2015).
*183 Contrary to the premise that underlies Smothers, when the framers drafted the Oregon Constitution in 1857, they would have understood that the common law was not tied to a particular point in time but instead continued to evolve to meet changing needs. See State v. Supanchick, 354 Or 737, 765, 323 P3d 231 (2014) (looking to common law as it evolved in America to determine scope of state confrontation clause). Put differently, nothing suggests that, when the framers drafted the remedy clause, they would have sought to tie the protections of that clause to the common law as it existed at a single point in time. We find no basis in the text of the remedy clause, its context, or its history from which we can conclude that the framers intended to limit the meaning of that clause to the concept of injury as it was defined in 1857.
In reaching a contrary conclusion, Smothers relied on dicta from a federal district court decision, Eastman v. Clackamas Cnty., 32 F 24 (CCD Or 1887). See Smothers, 332 Or at 122. We accordingly discuss that decision briefly. The plaintiff in Eastman had been injured in 1886 as a result of Clackamas County’s negligence in maintaining one of its bridges, and he sued the county to recover his damages. Eastman, 32 F at 26. Under the common law, a county was not liable for an injury resulting from a defect in one of its highways or roads. Rankin v. Buckman, 9 Or 253, 256 (1881).[6] Before the adoption of the Oregon Constitution, the Oregon territorial legislature changed that common-law rule and permitted tort and breach-of-contract actions against counties. Eastman, 32 F at 30-31.
In 1887, 30 years after the constitution had been drafted and one year after the plaintiff in Eastman had been injured, the legislature amended the territorial statute that had permitted counties to be sued. Id. at 31. It deleted the part of the statute allowing tort actions against counties, *184 with the result that the statute, as amended, permitted actions against counties only for breach of contract. Id.
Before the federal district court, the county argued that the plaintiffs action should be dismissed. The county explained that it was not liable for its torts at common law, and it noted that the territorial statute permitting tort actions against counties had been repealed. In considering the county’s argument, the district court first observed in dicta that the remedy clause froze in place both the common-law and statutory remedies that existed when the Oregon Constitution was enacted. Id. at 32. The district court reasoned:
“To begin with, it may be admitted that the remedy guaranteed by [the state remedy clause] is not intended for the redress of any novel, indefinite, or remote injury that was not then regarded as within the pale of legal redress. But whatever injury the law, as it then stood, took cognizance of and furnished a remedy for, every man shall continue to have a remedy for by due course of iaw. When [the Oregon] constitution was formed and adopted, it was and had been the law of the land, from comparatively an early day, that a person should have an action for damages against a county for an injury caused by its act or omission. If this then known and accustomed remedy can be taken away in the face of this constitutional provision, what other may not?”

Id.

Having raised the remedy clause as a possible answer to the county’s defense, the federal district court decided the case on a narrower ground. It held that the plaintiff had been injured before the legislature had repealed the statute permitting actions against counties for their torts, that the plaintiffs cause of action had “vested” when he had been injured, and that nothing in the 1887 amendment suggested that the legislature had intended the amendment to apply retroactively and take away a vested right. Id. at 34. Because the federal court held only that the 1887 amendment did not apply retroactively, its discussion of the remedy clause was dicta and had no binding effect in federal district court, much less in Oregon state courts.[7]
*185 Five years later, a plaintiff brought a negligence action in state court against a county to recover for an injury that occurred after the legislature had repealed the statute making counties liable for their torts. Templeton v. Linn County, 22 Or 314, 316-17 (1892). Although the plaintiff relied on the dicta in Eastman to argue that the remedy clause barred the legislature from repealing the statute giving him a right to sue the county for its torts, this court rejected that argument, describing it as “startling.” Id. at 316. This court reaffirmed that the legislature cannot take away a party’s “[v]ested rights” (the right to recover for injuries that had occurred while the statutory remedy was in place), but it held that the same limitation did not apply to “expectancies and possibilities in which the party has no present interest.” Id. at 318. Not only did Templeton reject the dicta in Eastman, but this court later explained that it had never adopted that dicta. Noonan v. City of Portland, 161 Or 213, 249, 88 P2d 808 (1939); Gearin v. Marion County, 110 Or 390, 400-01, 223 P 929 (1924).
Smothers based its holding tying the meaning of the remedy clause to Oregon common law in 1857 on federal dicta that this court described in Templeton as “startling” and that the court explained in Noonan and Gearin that it had never adopted.[8] It follows that the central premise of Smothers’ holding finds no support in the text of the remedy clause, and it is at odds with the text of Article XVIII, section 7, and the history underlying that section and Article I, section 10. As Professor Linde observed more than 30 years before Smothers was decided, “one doubts *186 that by the words ‘remedy by due course of law,’ Oregon’s constitution meant to freeze tort law as it stood either in 1859, or when this guarantee first entered state constitutions almost 200 years ago.” Linde, “Without Due Process,” 49 Or L Rev at 136. Indeed, both Justice O’Connell’s majority opinion and Justice Goodwin’s dissent in Holden expressly rejected the proposition that Smothers later embraced—that Article I, section 10, requires that every injury the common law recognized in 1857 be remedied in substantially the same form as that recognized when the constitution was first adopted. See Holden, 228 Or at 411-12 (majority); id. at 422 (Goodwin, J., dissenting).
We do not overrule our precedents lightly. See Farmers Ins. Co. v. Mowry, 350 Or 686, 261 P3d 1 (2011). As the court explained in Mowry, our “decisions ‘should be stable and reliable,’ because the Oregon Constitution is ‘the fundamental document of this state.’” Id. at 693-94 (quoting Stranahan v. Fred Meyer, Inc., 331 Or 38, 53, 11 P3d 228 (2000)). However, as the court also recognized in Mowry, “there is a ‘similarly important need to be able to correct past errors’ because ‘[t]his court is the body with the ultimate responsibility for construing our constitution, and if we err, no other reviewing body can remedy that error.’” Id. at 694 (quoting Stranahan, 331 Or at 53) (bracket in Mowry). The considerations that bear on when we should exercise that authority are difficult to reduce to a simple formula. Couey v. Atkins, 357 Or 460, 485, 355 P3d 866 (2015). Rather, as the court explained in Mowry, “stare deci-sis is a prudential doctrine that is defined by the competing needs for stability and flexibility in Oregon law.” 350 Or at 697-98.
In Couey, we identified “at least three categories [of error]” that will justify reconsidering a prior constitutional decision. 357 Or at 485. We observed:
“First, there are cases in which a prior pronouncement amounted to dictum or was adopted without analysis or explanation. *** Second, there are cases in which the analysis that does exist was clearly incorrect—that is, it finds no support in the text or the history of the relevant constitutional provision. *** Third, there are cases that *187 cannot be fairly reconciled with other decisions of this court on the same constitutional provision.”
Id. at 485-86 (citations omitted). Placing a decision in one of those three categories does not exhaust consideration of other factors that can bear on whether to adhere to or overrule that decision. As Mowry explained, a significant consideration can be whether others have “reified] on the rules of law announced by this court to structure their transactions.” 350 Or at 700-01 (insurance policies drafted and underwritten in reliance on judicial decision); see State v. Cuevas, 358 Or 147, 154, 361 P3d 581 (2015) (declining to overrule two decisions interpreting sentencing guidelines rules, in part, because those decisions had “been applied repeatedly in calculating innumerable sentences”). Moreover, the age of the decisions and the extent to which the issues have been fully litigated can matter. Compare Mowry, 350 Or at 700-01 (declining to overrule relatively recent decision where issue had been fully litigated), with State v. Mills, 354 Or 350, 366-71, 312 P3d 515 (2013) (overruling holding in 1923 case that had been adopted without discussion and cited without explanation in ensuing 90 years). The answer to the question whether a case should be overruled cannot be reduced to the mechanical application of a formula but requires instead an exercise of judgment that takes all appropriate factors into consideration. See Mowry, 350 Or at 697-98 (describing stare decisis as a prudential doctrine).
With that background in mind, we turn to the question whether we should overrule Smothers. As explained above, the central premise of Smothers finds no support in the text and history of Article I, section 10; it is at odds with the context found in Article XVIII, section 7; and it is squarely inconsistent with a series of this court’s cases holding that Article I, section 10, did not freeze rights and remedies as they existed in 1857. Additionally, Smothers is of relatively recent vintage, and it has not given rise to the sort of reliance interests that persuaded this court in Mowry to adhere to a prior statutory interpretation. Although the text and history of the remedy clause were considered at some length in Smothers, that factor, standing alone, does not persuade us to adhere to a case that was at odds with the text, history, and case law when it was decided and that *188 continues to prove problematic. For the reasons explained above, we overrule Smothers.[9]
C. This Court’s Other Remedy Clause Cases
The question that remains is whether, as defendant argues, our other remedy clause cases also should be overruled to the extent that they place a substantive limit on the legislature’s authority to alter or adjust remedies; that is, is defendant correct that the remedy clause provides only procedural protection? In considering that issue, we begin by summarizing our remedy clause cases that preceded and followed Smothers. We then turn to whether those cases are consistent with the text and history of the remedy clause.
1. Oregon remedy clause decisions
This court’s remedy clause decisions divide roughly into two groups. The first group arose out of claims against counties and cities for injuries caused by defects in their roads and streets. Those cases started from a premise that was familiar to the courts in the late nineteenth and early twentieth century, which Justice Bean summarized in his concurring opinion in Templeton: “By the decided weight of authority, a county is not liable for an injury received from a defective highway, unless by statute; while the courts seem equally agreed that such liability exists as against a municipal corporation.” Templeton, 22 Or at 320 (Bean, J., concurring).[10]
Following Templeton, this court routinely rejected the argument that the remedy clause entitled a plaintiff *189 to bring a negligence action against a county for failing to maintain its roads, in the absence of a statute authorizing the action. See, e.g., Schroeder v. Multnomah County, 45 Or 92, 96, 76 P 772 (1904). Negligence claims against cities presented a more complex issue. This court explained that cities were created by special charters, which imposed a duty on cities to maintain their streets in good repair. Rankin, 9 Or at 256-57. As a result, cities could be sued for negligently failing to satisfy that duty, unless the legislature exempted them from liability. Id.; see O’Harra v. The City of Portland, 3 Or 525, 526 (1870) (upholding provision in city charter exempting city from tort liability); cf. Mattson v. Astoria, 39 Or 577, 65 P 1066 (1901) (citing O’Harra for that proposition in the context of an Article I, section 10, case).
In Mattson, this court considered a statute that sought to exempt both a city and its officials from liability for negligently maintaining its streets. 39 Or at 578-79. The court held that, although the legislature could exempt a city from liability for breaching that duty, the remedy clause prevented the legislature from exempting both the city and its officials from all liability. 39 Or at 579-80. The court reasoned:
“[The remedy clause] was intended to preserve the common-law right of action for injury to person or property, and while the legislature may change the remedy or the form of procedure, attach conditions precedent to its exercise, and perhaps abolish old and substitute new remedies, * * * it cannot deny a remedy entirely.”
Id. at 580 (citations omitted); see Thomas M. Cooley, A Treatise on the Constitutional Limitations 289, 361-62 (1st ed 1868, reprinted 1972) (summarizing earlier cases).[11]
Over the next 40 years, this court considered a series of cases brought by persons injured as a result of defects in city streets. See Noonan, 161 Or at 223-35 (reviewing decisions). It adhered to the rule that the legislature can immunize a city from tort liability if the city officials or employees remain liable, but it reaffirmed that the legislature cannot *190 eliminate all or practically all liability for breach of a city’s duty by immunizing both the city and its employees. See id. at 237-38; Pullen v. Eugene, 77 Or 320, 328, 146 P 822 (1915) (upholding city charter provision providing a cause of action against city officials when damages exceeded $100); Batdorff v. Oregon City, 53 Or 402, 408-09, 100 P 937 (1909) (exonerating city from liability and permitting an action against city officials for gross negligence “practically denies a remedy to any person injured”). During that time, some judges expressed the view that leaving an injured plaintiff with a remedy only against a city employee was a poor substitute for a remedy against the city. See Colby v. City of Portland, 85 Or 359, 374, 166 P 537 (1917).[12] However, this court’s cases adhered, with some backing and filling, to the principle that the court first announced in Mattson—as long as legislation left the injured person with a remedy against either the city or a city employee, it did not violate Article I, section 10. See Noonan, 161 Or at 2223-35 (discussing decisions).[13]
In Mattson and the cases following it, the legislature had not altered the duty imposed on cities and their officials to maintain streets in good repair, but it had denied plaintiffs injured by a breach of that duty any remedy. Those cases recognized that a remedy against a city employee could be substituted for a remedy against the city, but those cases did not require this court to decide whether or on what terms the legislature could alter a common-law duty. That question began to arise in the second group of remedy clause cases that this court decided, which found their genesis in the opinion denying rehearing in Stewart v. Houk, 127 Or 589, 271 P 998, 272 P 893 (1928).
*191 The statute at issue in Stewart paralleled, in many respects, the statutes at issue in Mattson and its progeny. Like the statute in Mattson, the statute in Stewart provided that a guest injured while in a vehicle driven on Oregon public highways “‘shall have no right of recovery against the owner or driver of such motor vehicle.’” Id. at 591 (quoting statute). The statute did not affect the owner or driver’s duty to exercise due care, but it deprived an injured guest of any remedy for a breach of that duty. Id. at 595. This court accordingly concluded that the statute “withh[e]ld jural significance from a breach of duty which previously was regarded as a cause of action” in violation of the remedy clause. Id.
The defendant in Stewart petitioned for rehearing, arguing that the court’s decision was inconsistent with the Connecticut Supreme Court’s decision in Silver v. Silver, 108 Conn 371, 143 A 240 (1928). This court denied rehearing after explaining why the guest-passenger statute at issue in Silver differed from Oregon’s guest-passenger statute. This court noted that the Connecticut statute provided that a host was not liable to a guest for injuries caused by ordinary negligence but preserved liability in instances “where the injury was inflicted intentionally, heedlessly or through reckless disregard of the rights of others.” Id. at 597 (on rehearing). The court explained that the Connecticut legislature had sought “to fix the measure of care a host owed to his guest.” Id. at 598. It viewed the Oregon statute, by contrast, as not being an effort “to regulate the operation of automobiles by prescribing the duty of host to guest, but as one wherein this element of the situation remains untouched, and the sole change effected is the denial of the remedy to an injured guest.” Id. Having identified that distinction, the court denied the petition for rehearing.
After the court issued its decision in Stewart, the Oregon legislature enacted a statute that tracked Connecticut’s guest-passenger statute. The new statute provided that an owner or operator of a motor vehicle was liable to a guest for injuries sustained in an accident if the accident were intentional on the part of owner or operator or “ ‘caused by [the owner or operator’s] gross negligence or intoxication or reckless disregard of the rights of others.’” Perozzi, 149 *192 Or at 331 (quoting Or Laws 1929, ch 401, § 1). In holding that the new statute did not violate Article I, section 10, this court noted the United States Supreme Court’s decision in Silver upholding Connecticut’s statute against an equal protection challenge. Id. at 332-33. This court observed that, in upholding the distinction that Connecticut had drawn, the United States Supreme Court had relied on two state cases holding that, as a matter of state common law, “‘a lower standard of care should be exacted where the carriage in any type of vehicle is gratuitous.’” Id. at 333 (quoting Silver v. Silver, 280 US 117, 50 S Ct 57, 74 L Ed 221 (1929)).
This court looked to the state common-law decisions cited in Silver in holding that Oregon’s new guest-passenger statute did not violate Article I, section 10. Perozzi, 149 Or at 334-37. Specifically, this court relied on three state court decisions that held, as a matter of common law, that to “‘make out liability in case of a gratuitous undertaking the plaintiff ought to prove a materially greater degree of negligence than he has to prove where the defendant is to be paid for doing the same thing.’” Id. at 334 (quoting Heiman v. Kloizner, 139 Wash 655, 247 P 1034 (1926)); accord Massaletti v. Fitzroy, 228 Mass 487, 118 NE 168 (1917); Epps v. Parrish, 26 Ga App 399, 106 SE 297 (1921). In Massaletti, for example, the Massachusetts Supreme Judicial Court reasoned that a driver who gratuitously gave a guest a ride owed the same common-law duty that a gratuitous bailee would, with the result that both were liable only for gross negligence or bad faith. See Massaletti, 228 Mass at 489 (citing West v. Poor, 196 Mass 183, 81 NE 960 (1907)).
To be sure, the common-law position that Massachusetts, Washington, and Georgia adopted reflected a minority view, and this court considered whether a legislative enactment based on a minority view of the common law complied with Article I, section 10. In considering that question, the court focused on cases from other state courts with similar remedy clauses. For example, the court noted that the Florida Supreme Court had held that its remedy clause did not lock its legislature into a fixed version of the common law but left it free either to expand a plaintiffs remedies against a deceased tortfeasor or to uphold a statute *193 permitting cattle to roam free, contrary to a landowner’s common-law property rights. 149 Or at 343-44. Consistently with the Florida decision, this court noted in Perozzi that Article XVIII, section 7, of the Oregon Constitution expressly recognized that the legislature may alter or repeal the common law and that Article I, section 10, lacked terms that would demonstrate an intent to freeze in place the common law as it existed in 1857. Id. at 346-47.
This court accordingly declined to tie the legislature to a conception of the common law that would prevent it from amending the law to meet the “existing conditions and circumstances” of a given time. Id. at 348. It reasoned that, to hold otherwise, would fix into place doctrines such as the fellow-servant doctrine, contributory negligence, and assumption of risk. Id. As we read Perozzi, it held that, as a matter of state constitutional law, Article I, section 10, does not deny the legislature latitude to adjust the duties that one person owes another, based on the extent of the change and the reasons for the adjustment. Perozzi thus answered the question that Mattson and the cases that followed it had no occasion to decide—to what extent and on what grounds may the legislature modify common-law duties.
Cases following Perozzi have interpreted it as standing for the proposition that Article I, section 10, does not deny the legislature latitude to modify and sometimes eliminate common-law duties where changing conditions warrant it. See Noonan, 161 Or at 249 (“Article I, § 10, Oregon Constitution, was not intended to give anyone a vested right in the law either statutory or common; nor was it intended to render the law static”) Throughout the twentieth century, our cases have adhered to that proposition, while recognizing that the remedy clause places a substantive limit on the legislature. That is, within constitutional limits, the legislature has authority to alter a common-law duty or condition the procedural means of recovering for a common-law injury. For instance, in Josephs v. Burns & Bear, 260 Or 493, 491 P2d 203 (1971), this court upheld statutes of limitations on causes of action as having “always been considered a proper function of the legislatures * * * so long as it is done for the purpose of protecting a recognized public interest.” Id. at *194 503. Similarly, in Sealey v. Hicks, 309 Or 387, 788 P2d 435, cert den, 498 US 819 (1990), this court upheld a statute of repose for products liability actions, reasoning that the “legislature has the authority to determine what constitutes a legally cognizable injury.” Id. at 394.
In Hale, Clarke, and Howell, this court addressed a different question, which Smothers had noted but not reached: On what terms may the legislature, consistently with the remedy clause, alter a remedy for the breach of a recognized duty? In Hale, the court summarized prior cases in concluding that “it is enough [for the purposes of the remedy clause] that the remedy is a substantial one.” 308 Or at 523. In upholding a $100,000 cap on more than $600,000 in damages, the court focused on what later cases have referred to as a quid pro quo. Id. The court reasoned:
“The class of plaintiffs [who can seek a remedy under the Tort Claims Act] has been widened by the legislature by removing the requirement that an injured party show that the municipal corporation’s activity that led to the injury was a proprietary one. At the same time, however, a limit has been placed on the size of the award that may be recovered. A benefit has been conferred, but a counterbalancing burden has been imposed. This may work to the disadvantage of some, while it will work to the advantage of others. But all who had a remedy continue to have one.”
Id. In holding that the Tort Claims Act limitation constitutionally could be applied to the plaintiff in Hale, the court compared that statute to the workers’ compensation act, which expanded the class of plaintiffs eligible for a remedy but limited the extent of the remedy available for individual plaintiffs. Id. at 521-23.[14]
This court considered a similar issue in Clarke. Clarke, however, differed from Hale in three respects. First, in Clarke, the legislature had eliminated a cause of action against state employees for injuries resulting from their negligence and substituted a cause of action solely against *195 the state with capped damages of $200,000. 343 Or at 608. Second, the plaintiff in Clarke had sustained over $12 million in economic damages, compared to the $600,000 in damages that the plaintiff in Hale had sustained. See id. at 586. Finally, the court decided Clarke after it decided Smothers. See id. at 593. Smothers had disavowed the reasoning in Hale, 332 Or at 118, and Clarke accordingly followed Smothers in resolving the plaintiffs Article I, section 10, challenge. See Clarke, 343 Or at 591-93, 605-07 (discussing and following Smothers). That is, Clarke focused solely on whether capped damages of $200,000 was a “substantial” remedy in light of the economic damages that the plaintiff had suffered. See id. at 607 (framing the issue in light oí Smothers). The court held that it was not. Id. at 610; see id. at 611 (Balmer, J., concurring) (“The arbitrarily low cap on damages for medical malpractice claims against OHSU and its employees is a problem that has long called for a legislative solution.”).
By contrast, the court held in Howell that capped damages of $200,000 was a substantial remedy when the plaintiff had sustained $507,500 in total damages. 353 Or at 376. The court explained that the damage limitation “does not leave plaintiff‘wholly without a remedy,’ as was the case for the parents of the plaintiff in Neher. And it represents a far more substantial remedy than the paltry fraction that remained after the imposition of the limitation in Clarke.” Id.
Smothers characterized this court’s remedy clause cases as consisting of two phases, one of which lived up to the historical purposes of the remedy clause, the other of which grossly failed to realize them. In the first phase, Smothers explained, courts consistently reasoned that the purpose of the remedy clause was to mandate that a remedy be available to repair injuries recognized at common law to “absolute” rights. Those cases included Mattson, Stewart, and others holding that the complete elimination of all liability would violate the remedy clause. Smothers explained that, in the second phase, Perozzi and the cases that followed it strayed from the remedy clause’s historical purposes. Smothers reasoned that “[u]ntil 1935, this court’s case law was consistent with” the purpose of protecting “absolute common-law *196 rights.” Smothers, 332 Or at 118-19. In Perozzi, according to Smothers, this court erroneously imported federal equal protection analysis into Oregon’s remedy clause. Id. at 119. It followed, Smothers concluded, that any case that relied on Perozzi either directly or indirectly had erred, and Smothers disavowed them.[15]
In reviewing our remedy clause decisions, we view their development differently. Perozzi did not rely on federal equal protection analysis as Smothers perceived. Rather, as explained above, the reasoning in Perozzi consisted of an extensive analysis of the Oregon Constitution, the text of the remedy clause, the text of Article XVIII, section 7, and common-law decisions from other states. Only in explaining the development of guest-passenger statutes similar to the one at issue in Perozzi did this court discuss Silver and, even then, to recognize, as the common-law decisions it cited had done, that a state could find that a gratuitous host owed the same degree of care to his or her passengers that a gratuitous bailee owed at common law. See Perozzi, 149 Or at 332-35. Perozzi’s ground for decision was its analysis of Article I, section 10, of the Oregon Constitution. See id. at 348-50. For that reason, the cases relying on Perozzi were not sipping from a poisoned wellspring. Rather, they were relying on a case that took a considered view of the text, context, and purposes of Oregon’s remedy clause.
As we view the two phases of our remedy clause cases, the first phase dealt with statutes in which the legislature had imposed a duty of care but eliminated any remedy for a breach of that duty. As legislative enactments grew more complex, the second phase of our remedy clause cases focused on statutes that modified either a duty or a remedy, but they did not retain a duty while eliminating any remedy for its breach, as the earlier statutes had done. In considering those later statutes, our cases recognized that the legislature was not precluded from altering the duty that one person owes another or even eliminating common-law causes of action and defenses, such as alienation of affections and *197 contributory negligence, when the premises for recognizing the cause of action or defense had changed. Another group of our second-phase remedy clause cases recognized that the legislature could modify remedies for a recognized duty as long as the remedy that remained was substantial. Far from reflecting an aberrant view of state constitutional law, as Smothers concluded, the second phase of our remedy clause cases considered differing statutory schemes and, in doing so, complemented and refined the principles recognized in Mattson and its progeny.
We accordingly disagree with Smothers that we either can or should disregard Perozzi and the cases that followed it. We also disagree with Smothers that the two phases of our remedy clause cases are unalterably in conflict. Rather, the conflict that Smothers perceived appears to have derived primarily from its conclusion that our early remedy clause cases reflected its view of Article I, section 10. That is, Smothers viewed our early remedy clause cases as preventing the legislature from modifying Oregon common law as it existed in 1857, and it concluded that our early cases, viewed that way, were in conflict with the cases that followed. As explained above, however, the difficulty with Smothers’ conclusion lies in its premise. Our early remedy clause cases looked to the common law as a guide, not as a procrustean template. Moreover, those cases considered statutes that either imposed or recognized a duty but denied any remedy, while the cases that followed considered statutes that altered the duty one person owes another or the remedy for the breach of that duty, sometimes as part of a quid pro quo. Properly viewed, the second phase of our remedy clause cases complements the first.[16]
With our remedy clause cases (other than Smothers) in mind, we return to defendant’s argument that we should overrule those cases because Article I, section 10, is not “a substantive guarantee of a remedy *** [but] rather, *198 guarantees access to the courts [only] for such remedies as the law may provide.” We begin, as usual, with the text of the remedy clause and then turn to its history.
2. Text
We discussed the text of the remedy clause earlier and concluded that the text does not provide a clear answer as to the clause’s meaning. As explained above, the text could be merely a guarantee of equal access to the remedies that the legislature has provided. The text, however, could be as much about the availability of a remedy for injuries to person, property, or reputation as it is about the due course of the law by which the remedy will be administered. We accordingly look to the history of the remedy clause for guidance in determining whether our remedy clause cases are clearly incorrect. We consider the English sources for the remedy clause, the early American charters and constitutions, the early and mid-nineteenth-century cases from other states interpreting their remedy clauses, and the enactment history of the Indiana and Oregon remedy clauses.
3. English sources of the remedy clause
Oregon’s remedy clause stems from Lord Coke’s interpretation of Chapter 29 of the 1225 version of Magna Carta, which combined Chapters 39 and 40 of the 1215 version of Magna Carta. Linde, Without “Due Process,” 49 Or L Rev at 138. Chapter 29 of Magna Carta provides:
“No freeman shall be taken or imprisoned, or be disseised of his freehold, or liberties, or free customs, or be outlawed, or exiled, or any other wise destroyed; nor will we not pass upon him, nor condemn him, but by lawful judgment of his peers, or by the law of the land. We will sell to no man, we will not deny or defer to any man either justice or right.”
Edward Coke, The Second Part of the Institutes of the Laws of England 45 (1797 ed) (setting out Chapter 29). Coke explained that this “Chapter containeth nine severall branches.” Id. at 46. He identified the “sense” or nature of each branch, and then explained how “the same hath been declared and interpreted. 1. By authority of Parliament. 2. By our books. 3. By Precedent.” Id. As Coke’s stated methodology makes clear, he viewed both the acts of parliament and the common law as *199 implementing the larger principles stated in Magna Carta. That is, Coke viewed the common law and the acts of parliament as a continuation of the principles stated in Magna Carta that checked the king’s arbitrary exercise of power.
The first six branches of Chapter 29 that Coke identified derived from Chapter 39 of the 1215 version of Magna Carta and limited the king’s authority to deprive a person of his land, liberty, livelihood, and benefit of the law except “by the law of the land,” which Coke explained meant “(that is to speak it once for all) by the due course, and processe of law.” Id. After explaining how the courts and parliament had implemented the first six branches of Chapter 29, Coke turned to the remaining three branches, which derived from Chapter 40 of the 1215 version of Magna Carta. He listed the “sense” of those three branches as follows:
“7. We shall sell to no man justice or right.
“8. We shall deny to no man justice or right.
“9. We shall defer to no man justice or right.”
Id. In discussing the last three branches of Chapter 29, Coke analyzed the seventh branch separately from the eighth and ninth branches, which he grouped together. See id. at 55-56 (analyzing the seventh branch); id. at 56 (analyzing the eighth and ninth branches).
Coke explained that the eighth and ninth branches focused on protecting the common-law courts from royal interference. He stated that those branches “have been excellently expounded by latter acts of parliament, that by no meanes common right, or common law be disturbed, or delayed” by the king’s exercise of the “great seale, or privie seale, order, writ, letters, message, or commandement whatsoever.” Id. at 56. Coke recognized that the king may stay suits in his own courts, but he viewed the king’s efforts to stay or interfere with the common-law courts as contrary to the acts of parliament and Magna Carta. Id.
The seventh branch reflects a separate guarantee. Because Oregon’s remedy clause derives from Coke’s discussion of that branch, we quote his discussion in full:
*200 “Nulli vendemus,[17] &c.
“This is spoken in the person of the King, who in judgment of Law, in all his Courts of Justice is present, and repeating these words, nulli vendemus, &c.
“And therefore, every subject of this realme, for injury done to him in bonis, terres, vel persona,[18] by any other subject, be he ecclesiasticall, or temporall, free, or bond, man, or woman, old, or young, or be he outlawed, excommunicated, or any other without exception, may take his remedy by the course of the law, and have justice, and right for the injury done to him, freely without sale, fully without any deniall, and speedily without delay.
“Hereby it appeareth, that justice must have three qualities, it must be libera, quia nihil iniquius venali justitia; plena, quia justititia non debet claudicare; et celeris, quia dilatio et quaedam negatio;[19] and then it is both Justice and Right.”
Id. at 55-56.
Three propositions follow from Coke’s text. First, the second paragraph quoted above focuses on ensuring that “every subject” has access to a remedy, without regard to the subject’s age, status, or gender. The emphasis is on equal access to the courts. The second proposition is consistent with the first. After stating in the first paragraph that the king is present in the courts and promising that he will sell no man justice and right, Coke begins the next paragraph with the phrase “And therefore.” The phrase “And therefore” implies that the passage that follows flows from the king’s promise that justice will not be limited only to those persons who can afford it. Put differently, because a person’s access to justice will not turn on the person’s ability to buy a more expeditious or effective writ, every person “may take” a remedy for injuries without regard to wealth, age, status, or gender.
*201 Coke’s text also suggests a third proposition—that the promise of a remedy for injuries to specific interests is not limited to equal access. The text recognizes that, in gaining access to the courts and the common law, every man shall “have justice, and right for the injury done to him.” That is, Coke assumed that access to the common-law courts and the common law carried with it access to justice and right for injuries. Coke had little occasion to consider the extent to which parliament could alter the common law or the limits on its authority to do so. For the most part, he viewed the acts of parliament as supplementing and confirming the common law. See Nathan S. Chapman & Michael W. McConnell, Due Process as Separation of Powers, 121 Yale LJ 1672, 1685 (2012) (“The common law, [Coke] maintained, had developed organically through the adjudication of the courts since time immemorial, as well as through certain declaratory acts of Parliament, which themselves were believed to articulate principles with an ancient origin.”). It is thus difficult to find in Coke an answer to the question whether a promise of equal access to the common-law courts imposed a substantive limit on parliament’s ability to depart from the common law. That question was largely foreign to Coke’s view.[20]
Sir William Blackstone, as other commentators have noted, largely agreed with Coke’s interpretation of Chapter 40 of Magna Carta. See Thomas R. Phillips, The Constitutional Right to a Remedy, 78 NYU L Rev 1309, 1322 (2003) (describing Blackstone’s approach). In his Commentaries on the Laws of England, Blackstone paraphrased Coke’s explanation of that chapter while adding his own gloss. William Blackstone, 1 Commentaries on the Laws of England 137-38 (1st ed 1765). Blackstone viewed Chapter 40 as directed both at the king and judges— specifically, as telling the king that he cannot issue commands or letters that override common-law procedures and *202 telling the courts that if they receive such things they should disregard them:
“[I]t is enacted, that no commands or letters shall be sent under the great seal, or the little seal, the signet, or privy seal, in disturbance of the law; or to disturb or delay common right: and, though such commandments should come, the judges shall not cease to do right.”
Id. at 138. Blackstone agreed with Coke that the general purpose of Chapter 40 was to prevent royal interference with the common-law courts.
Blackstone’s Commentaries also shed light on parliament’s ability to alter the common law. In commenting on Coke’s explication of Chapter 40—that “every Subject *** for injury done to him in bonis, in ierres, vel persona *** may take his remedy by the course of the Law,” Blackstone explained:
“It were endless to enumerate all the affirmative acts of parliament wherein justice is directed to be done according to the law of the land: and what that law is, every subject knows; or may know if he pleases; for it depends not upon the arbitrary will of any judge; but is permanent, fixed and unchangeable, unless by authority of parliament."
Id. at 137 (second emphasis added). Blackstone made the point clearer in the next paragraph. He explained that “[n]ot only the substantial part, or judicial decisions, of the law, but also the formal part, or method of proceeding, cannot be altered but by parliament." Id. at 138 (emphasis added). Blackstone’s gloss on Coke thus explicitly recognized parliament’s authority to alter the “substantial part, or judicial decisions, of the law.”
In analyzing the effect of Blackstone’s Commentaries on the meaning of Oregon’s remedy clause, Smothers did not discuss Blackstone’s analysis of Coke’s commentary on Chapter 40. See 332 Or at 98-99. Smothers focused instead on a distinction that Blackstone drew between absolute and relative rights. See id. To the extent that Smothers viewed Blackstone’s reference to absolute rights as simply identifying the three rights (property, person, and reputation) that *203 the remedy clause protects, Smothers’ discussion of absolute rights adds little to the analysis. The text of the clause specifies the types of rights to which it applies. See Juarez, 341 Or at 173 (explaining that loss of deceased’s society, guidance, and emotional support did not constitute injury to person, property, or reputation within the meaning of the remedy clause).
To the extent that Smothers found in the word “absolute” the idea that Blackstone viewed absolute rights as immune from alteration, Smothers appears to have misperceived what Blackstone said. Blackstone used the phrase “absolute rights” to refer to a person’s rights in a state of nature. Blackstone, 1 Commentaries at 121. He explained, however, that absolute rights are not absolute. Rather, “every man, when he enters into society, gives up a part of his natural liberty, as the price of so valuable a purchase; and, in consideration of receiving the advantages of mutual commerce, obliges himself to conform to those laws, which the community has thought proper to establish.” Id. Blackstone explained that laws could limit a person’s natural rights if those laws were “necessary and expedient for the general advantage of the publick” while also recognizing that “wanton and causeless restraint of the will of the subject, whether practiced by a monarch, a nobility, or a popular assembly, is a degree of tyranny.” Id. at 121-22.
Having established that general framework for legislation, Blackstone explored the contours of what he described as “the three great and primary rights, of personal security, personal liberty, and private property.” Id. at 136. He then identified five “other auxiliary subordinate rights of the subject, which serve principally as barriers to protect and maintain” those “three great and primary rights.” Id. at 136. Those were (1) the “constitution, powers, and privileges of parliament”; (2) the limitation of the king’s prerogative; (3) the right of “every Englishman * * * of applying to the courts of justice for redress of injuries”; (4) the right to petition the king or either house of parliament for the redress of “any uncommon injury”; and (5) the right “of having arms for their defence, suitable to their condition and degree, and such as are allowed by law.” Id. at 136-39.
*204 In describing the third subordinate right, Blackstone paraphrased Coke’s discussion of Chapter 40 of Magna Carta and, as discussed above, expressly recognized parliament’s authority to alter “[n]ot only the substantial part, or judicial decisions, of the law, but also the formal part, or method of proceeding.” Id. at 138. Although Blackstone recognized that parliament had authority to alter the common law, he did not examine the limits of that authority. Like Coke, he appears to have assumed that the English government was framed in such a way that, in altering the common law, parliament would adhere to the natural law principles that informed its ability to add to and supplement the common law. See id. at 122 (explaining that legislation that advances a public purpose, “when prudently framed, [is] by no means subversive but rather introductive of liberty”). Far from stating that the legislature lacks authority to alter the common law, Blackstone’s discussion of both Coke and absolute rights demonstrates that he viewed the legislature as having greater authority to adjust absolute rights than Smothers recognized. As Justice Landau explained in his concurring opinion in Klutschkowski, “[t]o say *** that Blackstone asserted a common-law right to a remedy superior to legislative authority is quite at odds with what Blackstone actually said.” 354 Or at 184 (Landau, J., concurring).
Having considered Coke’s Institutes and Blackstone’s Commentaries, we cannot say that they demonstrate conclusively that our remedy clause cases (with the exception of Smothers) were clearly wrong. It is true that Coke’s explication of Chapter 40 of Magna Carta focused on access to the courts, as did Blackstone’s gloss on Coke. However, for Coke and Blackstone, access to the courts carried with it access to a set of common-law remedies for injuries to person, liberty, and property. Both Coke and Blackstone assumed, in differing degrees, access to a “permanent, fixed, and unchangeable” body of common law that followed from access to the courts. Blackstone, 1 Commentaries at 137. Blackstone, more than Coke, recognized parliament’s authority to vary to the common law as far as was “necessary and expedient for the general advantage of the publick.” Id. at 121. Blackstone is thus consistent with our remedy clause cases that have *205 recognized the legislature’s authority to alter the common law.
We recognize that Coke and Blackstone were concerned with the king’s interference with access to the common-law courts and the protections those courts provided. We also recognize that both writers typically viewed parliament as confirming or supplementing the common law. However, in Dr. Bonham’s Case, 77 Eng Rep 646, 652 (CP 1610), Coke explained in dicta that “[W]hen an Act of Parliament is against common right and reason, or repugnant, or impossible to be performed, the common law will controul it, and adjudge such Act to be void.” Precisely what Coke meant by that statement has been the subject of scholarly debate. See Chapman & McConnell, Due Process as Separation of Powers, 121 Yale LJ at 1689-92 (summarizing debate). Some scholars view that statement as a recognition that the common law would trump conflicting statutes. Id. Others view it as giving substantial leeway to courts to interpret statutes so that they conform to common law. Id. Chapman and McConnell conclude that the latter understanding is the better one. Id. Even if that is the better understanding, the ambiguity inherent in Coke’s statement makes it more difficult to say that this court’s decisions finding in the remedy clause a substantive limit on legislative authority are clearly at odds with the source of our remedy clause.
4. American authorities
Early American charters or legal compacts contained provisions with striking resemblances to modern remedy clauses. For instance, the “Laws Agreed Upon in England” written by William Penn and adopted in 1682 provided that “all courts shall be open, and justice shall neither be sold, denied nor delayed.” See William Penn, “Laws Agreed Upon in England,” in 1 The Federal and State Constitutions, Colonial Charters, and other Organic Laws of the States, Territories, and Colonies 3060 (Francis N. Thorpe ed., U.S. Gov’t Printing Office 1909). Similar provisions appeared in Chapter XXIII of “The Charter or Fundamental Laws, of West New Jersey, Agreed Upon - 1676” and Chapter XIX of “The Fundamental Constitutions for the Province of East New Jersey in America, Anno Domini 1683.” See 5 *206 The Federal and State Constitutions, Colonial Charters, and other Organic Laws of the States, Territories, and Colonies at 2551, 2580.
The clauses found in those early charters may have been responding to the same royal interference with access to the courts that afflicted sixteenth- and seventeenth-century English courts. However, it is difficult to draw much significance from the inclusion of those clauses in early American charters and compacts. Not every charter or compact contained a provision that resembled what we know as a remedy or open-courts clause, and those charters that did contain one did not necessarily emphasize the same concepts that Coke’s interpretation emphasized. Additionally, no reported contemporaneous case reveals the problems those clauses were intended to address. See Hoffman, Questions Before Answers, 32 Rutgers LJ at 1027-29. Finally, the American founders found inspiration in more than just the writings of Coke or Blackstone. See James R. Stoner, Jr., Common Law and Liberal Theory: Coke, Hobbes, and the Origins of American Constitutionalism 137-61 (1992) (describing the influence of Locke and Montesquieu). For those reasons, it is difficult to tell what meaning the remedy clause would have had to an early American audience.
What can be said more confidently is that, over a century later, Blackstone and Coke’s ideas resonated with early American thinkers. In the mid-eighteenth century, American colonists grew increasingly disgruntled about the dependence of local judges and magistrates on the British crown. See John Dickinson, Letter IX, 1768, in 1 The Political Writings of John Dickinson 228 (1801). Dickinson’s main concern was that local judges would depend too much on the views and prerogative of the British crown if the crown paid their salaries. Id. at 228-29. Unlike in Britain, where the 1701 Act of Settlement ensured that judges no longer depended on the crown for their salaries, the Act of Settlement did not apply in America, raising the same anxiety about arbitrary decision-making based on favoritism or royal willfulness that had worried Coke in seventeenth-century England. Jonathan M. Hoffman, By the Course of the Law: The Origins of the Open Courts Clause of State Constitutions, 74 Or L Rev 1279, 1300 (1995).
*207 The concern about corruption through the payment of salaries gave way to larger concerns about arbitrary, unreasonable interference into colonial courts by the British parliament. The Stamp Act in 1765, for instance, required that every official document, including legal documents, have on it an official stamp, or otherwise the courts would be closed to claimants. Edward S. Morgan & Helen M. Morgan, The Stamp Act Crisis: Prologue to Revolution 120, 130-31 (1953). In response, revolutionary leaders petitioned to reopen the courts.[21]
Eventually, as the Revolutionary War started, the concern about an independent judiciary in the form of open courts available to all litigants took root in early state constitutions. The 1776 Declaration of Rights in Delaware provided:
“That every Freeman for every Injury done him in his Goods, Lands or Person, by any other Person, ought to have Remedy by the Course of the Law of the Land, and ought to have Justice and Right for the Injury done to him freely without Sale, fully without any Denial, and speedily without Delay, according to the Law of the Land.”
A Declaration of Rights and Fundamental Rules of the Delaware State, in 2 Sources and Documents of United States Constitutions 197, 198 (William F. Swindler ed., 1973). By 1787, Maryland, Massachusetts, New Hampshire, and North Carolina had adopted similar provisions in their state constitutions, and by 1857, a remedy clause appeared in over 30 state constitutions.
Between the end of the War for Independence and the adoption of the Constitution of the United States, distrust of state legislatures grew. Gordon S. Wood, The Creation of the American Republic 1776-1787, 403-29 (1969). Problems included “[t]he confiscation of property, the paper money schemes, the tender laws, and the various *208 devices suspending the ordinary means for the recovery of debts.” Id. at 404. It is difficult to tell, however, whether the states that adopted remedy clauses adopted them because of a concern about legislative overreaching, primarily for two reasons. The earliest remedy clauses predated the period during which legislatures were most abusive. See Hoffman, Questions Before Answers, 32 Rutgers LJ at 1038. Moreover, the sources describing popular distrust of the legislatures do not describe, much more mention, state remedy clauses as a potential solution. See Wood, The Creation of the American Republic at 430-67. The circumstances surrounding the adoption of those state remedy clauses do not suggest that they were intended to limit legislative authority. However, the early and mid-nineteenth-century cases interpreting those clauses point in a different direction.
5. Early and mid-nineteenth-century cases
The early and mid-nineteenth-century cases, with a fair amount of uniformity, interpreted their state remedy clauses as placing some substantive limit on legislative action. The cases are not uniform, however, in identifying the extent to which remedy clauses limit legislative choices. The earliest case to interpret a remedy clause provision was Stowell v. Flagg, 11 Mass 364 (1814).[22] In Stowell, the issue was whether a landowner could bring a common-law action for trespass on the case against a mill owner for causing water to periodically flow over his land when a statute provided a more limited remedy.[23] The Supreme Judicial Court initially concluded that the legislature had intended to substitute the statutory for the common-law remedy to prevent “burden [ing] the owner of a mill with continual lawsuits and expenses.” Id. at 366. In response to the argument that displacing the common-law action violated that state’s remedy *209 clause, the Supreme Judicial Court held that the legislature has “a right to substitute one process for another; as for instance, they may declare that, for an assault and battery, an action of the case shall be brought, instead of an action of trespass; or that the process shall be by complaint, and not by writ.” Id. at 365-66.
Although the Massachusetts Supreme Judicial Court recognized in Stowell that the remedy clause did not prohibit a legislature from substituting one remedy for another, it recognized, in a related context, that the complete denial of a remedy could violate a party’s rights. Call v. Hagger, 8 Mass 423, 430 (1812) (explaining that complete denial of a remedy could impair the obligations of contract in violation of the federal contract clause). In making that observation, the Supreme Judicial Court of Massachusetts contrasted a complete denial of a remedy with a “limitation of suits at law, [which] when enacted with a due discretion, and a reasonable time allowed for the commencement of suits on existing demands, are wholesome and useful regulations.” Id. The court thus recognized that the reasonableness of the legislature’s limitation of a party’s remedy could affect its constitutionality.
The Maine Supreme Court reached a similar conclusion under its state remedy clause in Gooch v. Stephenson, 13 Me 371 (1836). At common law, a property owner could bring a trespass action if another person’s cattle strayed onto his or her property. Id. at 375. Initially, the Maine legislature eliminated a trespass action if cattle were on the highway and the property owner’s fence was not sufficient to keep them out. Id. Later, the legislature extended the law to apply to cattle that strayed from adjoining lands onto a neighbor’s property. Under the statute, a property owner who failed to maintain a “sufficient” fence could not bring a trespass action if the cattle strayed onto his or her land but could bring a trespass action if the owner had constructed a sufficient fence and the cattle broke through. Id. The statutes departed from the common law by placing the burden on the property owner to take reasonable steps to keep cattle out of his or her property as a condition of maintaining a trespass action.
*210 In holding that the legislature could constitutionally alter the common law, the Maine Supreme Judicial Court explained:
“It was for the legislature to determine what protection should be thrown around this species of property; what vigilance and what safeguards should be required at the hands of the owner; and where he might invoke the aid of courts of justice. They have no power to take away vested rights; but they may regulate their enjoyment. Lands in this country cannot profitably be cultivated, if at all, without good and sufficient fences. To encourage their erection, it is undoubtedly competent for the legislature to give to the owners of lands thus secured, additional remedies and immunities.”
Id. at 376-77.[24] Stowell and Gooch sound two themes that are fairly consistent in mid-nineteenth-century cases. First, legislatures may not enact laws that apply retroactively, a concept expressed in the phrase “vested rights.” Second, legislatures possess authority to make reasonable adjustments in common-law rights, either by substituting one remedy for another or by altering the terms on which a common-law cause of action may be brought. That is true even when the legislature limits the common-law property rights and remedies that a landowner otherwise would have enjoyed.
Some courts interpreted their remedy clauses as checks on arbitrary interference into court procedures. As the Pennsylvania Supreme Court explained, the remedy clause was intended to prohibit “legislative and executive interference” with “judicial proceedings,” just as Magna Carta prevented such interference by royal officials or magistrates. Menges v. Dentler, 33 Pa 495, 498 (1859); see also Sharpless v. Mayor of Philadelphia, 21 Pa 147, 166 (1853) (noting that state remedy clause was “clearly intended to insure the constant and regular administration of justice between man and man”). Often, that consideration was reflected in *211 cases holding that statutory changes could not be applied retroactively to “vested rights.” See, e.g., Kay v. Pennsylvania R.R. Co., 65 Pa 269, 277 (1870) (“The law of the case at the time when it became complete is an inherent element in it, and if changed or annulled the right is annulled, justice is denied, and the due course of law violated.”); Townsend v. Townsend, 7 Tenn 1, 15 (1821) (invalidating statute that suspended right to execute on contract judgments “where the law, operating upon the contract when first made, held out to the creditor the promise of immediate execution after judgment”); Fisher’s Negroes v. Dabbs, 14 Tenn 119, 136 (1834) (invalidating statute that required court to dismiss pending case from its docket).
Some mid-nineteenth-century cases assumed that remedy clauses would prevent the total elimination of a common-law tort remedy. However, most of those cases used the remedy clause as a ground for interpreting statutes narrowly to avoid a construction that would deny a plaintiff a common-law remedy for an injury. For example, in Schuylkill Navigation Co. v. Loose, 19 Pa 15 (1852), a statute provided for compensation when a canal company’s dam caused another person’s land to be flooded. Id. at 16. When a company’s embankment (but not its dam) caused the plaintiff’s land to flood, the company defended against the plaintiffs damages action on the ground that the statute displaced the common law and authorized a remedy only for flooding caused by the construction of a dam. After quoting Pennsylvania’s remedy clause, the court concluded that the statutory remedy did not displace the plaintiffs common-law remedies. The court explained:
“It is impossible, in the face of principles of justice so clearly and solemnly announced [in that state’s remedy clause], to suppose that the Legislature, when providing for a remedy for an acknowledged injury, mean[t] to take it away unless the injury arise in one specified form.”
Id. at 18.
Other courts similarly looked to their remedy clauses in limiting, by means of interpretation, the reach of legislative enactments. In Thornton v. Turner, 11 Minn 336 (1866), a statute provided that an “‘action for damages, *212 occasioned by the erection and maintenance of a milldam,’ ” must be brought within “‘two years after the erection of such dam.’” Id. at 339 (quoting statute). The court observed that, if a dam were erected but not used for more than two years, the statute would prohibit a landowner whose land was flooded from recovering his or her damages. Id. at 339-40. Reasoning that such a result would be contrary to Minnesota’s remedy clause, the court held that the two-year limitations period would run not from the date of the “erection of such dam” but from the date on which the erection of the dam caused water to flood the plaintiffs land. Id. at 340; accord Hotchkiss v. Porter, 30 Conn 414, 421 (1862) (holding that statute did not cause constitutional difficulties because the statute, properly interpreted, did not shift burden to prove malice in libel cases to recover actual damages).
Finally, some courts relied on their remedy clauses to invalidate statutes imposing a burden on litigants. Riggs, Peabody & Co. v. Martin, 5 Ark 506, 509 (1844) (striking down statute that required parties to swear in open court that estate owed them money, permitting claimants to submit affidavits in lieu of appearing personally). See also Weller v. City of St. Paul, 5 Minn 95, 101 (1860) (requiring payment of all unpaid property taxes as condition of bringing suit to set aside assessment violated state remedy clause); Wilson v. McKenna, 52 Ill 43, 49 (1869) (same).[25]
Those early and mid-nineteenth-century cases reflect a diverse understanding of state remedy clauses. At least two common themes can be identified, however. First, most early and mid-nineteenth-century cases started from the proposition that state remedy clauses limit legislative as *213 well as executive acts. With the exception of the Kentucky case noted in the above footnote, the cases recognized that legislative interference with the courts and legislative action could violate a litigant’s constitutionally protected right to a remedy. That was so even though the state remedy clauses found their source in Coke and Blackstone’s concern about executive interference with the courts, even though there is little enactment history to suggest that states adopted remedy clauses in response to legislative overreaching, and even though the state cases do not reflect agreement on the extent to which state remedy clauses limit legislative authority.
Second, and consistently with our initial conclusion regarding Smothers, we can find little evidence that the cases viewed remedy clauses as locking common-law rights in place. Rather, they reflected the proposition that legislatures may adjust the parties’ common-law rights and remedies as long as the legislation did not apply retroactively and thus interfere with a party’s vested rights. They also recognized that the legislature may substitute one remedy for another, even though the new remedy effectively limited common-law rights. And they were consistent with the generally accepted nineteenth-century proposition that, although the legislature could substitute one remedy for another, it could not deny a remedy completely. Finally, some mid-nineteenth-century cases relied on their states’ remedy clauses to interpret statutes to avoid denying a party any remedy for an injury to property, person, or reputation.
The mid-nineteenth-century cases that are contemporaneous with the adoption of Oregon’s constitution are consistent with our remedy clause cases, with the exception of Smothers. Some of the cases from other states assume, as Mattson and its progeny held, that recognizing a duty while denying a remedy entirely would raise constitutional problems. Thornton, 11 Minn at 340; see Call, 8 Mass at 430 (contract clause). Other cases recognize, however, as Perrozi and later Oregon cases have, that common-law remedies are not unalterable. Stowell, 11 Mass at 365-66. Rather, the legislature may adjust common-law causes of action and substitute one remedy for another. Id. Perhaps our early cases interpreted Oregon’s remedy clause more robustly than other courts did. However, there is sufficient diversity among the *214 remedy clause decisions from other states that we find it difficult to say that, with the exception of Smothers, our cases interpreting Oregon’s remedy clause were clearly incorrect.
6. Later nineteenth-century damage cap cases
Towards the end of the nineteenth century, courts considered the kind of remedial limitations at issue in this case. The earliest cases came from Pennsylvania and were issued at least a decade after Oregon adopted Article I, section 10. See Kay, 65 Pa at 269. In Kay, the Pennsylvania Supreme Court held that a damages cap could not be applied to an injury that had occurred before the legislature enacted the cap. See id. at 277. The court explained that “a right to recover full compensation to the extent of the damage suffered vested in the plaintiff” when the injury occurred and that the legislature could not retroactively alter that vested right. Id. The court expressly declined to address the constitutionality of the law imposing a cap on damages “[a]s to cases happening after the passage of the law.” Id.
In 1874, the people of Pennsylvania amended their constitution by adding a new section that expressly prohibited limitations on damages. See Pa Const, Art III, § 21 (providing that “ [n] o act of the general assembly shall limit the amount to be recovered for injuries resulting in death, or for injuries to persons or property”). After that, the Pennsylvania Supreme Court struck down a statute limiting the maximum amount of damages an injured plaintiff could recover against railroad companies. Cent. Ry. of N.J. v. Cook, 1 WNC 319 (Pa 1875). The opinion was per curiam, and it is not possible to tell from either the supreme court or the trial court’s opinions the basis on which the Pennsylvania Supreme Court concluded that “the learned Judge below did not err in holding that the plaintiff could recover more than [the capped damages].” Id. The court could have relied on the remedy clause or on the 1874 constitutional amendment prohibiting any limit on the amount that could be recovered for injuries to persons. See Phillips, Constitutional Right to a Remedy, 78 NYU L Rev at 1329 (noting that ambiguity).
Five years later, in Thirteenth and Fifteenth Streets Passenger Ry. Co. v. Boudrou, 92 Pa 475 (1880), the Pennsylvania Supreme Court revisited the issue. In *215 reaffirming that a damages cap violated the Pennsylvania Constitution, the court appears to have relied “on the right to remedy by due course of law.” Id. at 482. However, the decision also can be read to rely on both the remedy clause and the later damage-limitation clause. See id. (“The people have withheld power from the legislature and the courts to deprive them of that remedy, or to circumscribe it so that a jury can only give a pitiful fraction of the damage sustained.”).
The 1874 amendment to Pennsylvania’s constitution and the decisions in Cook and Boudrou can be read more than one way. On the one hand, they suggest that ideas about a plaintiff’s right to a remedy were beginning to evolve in the later part of the nineteenth century. On the other, they could signal that the remedy clause, standing alone, was not viewed as sufficient protection against damage caps and that additional constitutional limitations on legislative authority were necessary. Read either way, those events occurred after Oregon’s framers drafted Article I, section 10. No early Oregon case cited Cook or Boudrou, and the influence of those Pennsylvania cases outside of that state is not clear. While those cases may be helpful in illuminating the issues that later arose as legislatures began to limit remedies, they are less significant in determining the purpose and meaning of Oregon’s remedy clause.
7. Indiana and Oregon constitutional conventions
The other primary sources shedding light on the meaning of our remedy clause are the 1851 Indiana Constitutional Convention, which produced Article I, section 12, of the 1851 Indiana Constitution, the basis of Article I, section 10, of the Oregon Constitution, and the debates and proceedings of Oregon’s own convention in 1857.
We have no record of debates among the Indiana framers that would show how they viewed the meaning or scope of their remedy clause. We do know, as this court in Smothers observed, that as they amended parts of the 1816 Indiana Constitution, the Indiana framers generally sought to limit the powers of the legislature. Smothers, 332 Or at 106. But we cannot tell whether the remedy clause *216 in Article I, section 12—largely unchanged from its previous version in 1816—was part of that project. Without more specific evidence, we can draw no conclusion about whether the 1851 revisions to Article I, section 12, of the Indiana Constitution substantially changed its meaning.
The same is true of the changes that the Oregon framers made in adopting Article I, section 10. The Oregon framers did not debate Article I, section 10, and, except for a minor change, adopted it wholesale from the 1851 Indiana Constitution. That minor change deserves some mention, however. It helps to put the two provisions side by side:
[[Image here]]
This court in Smothers found it significant that the Oregon framers decided to “express in one clause how justice is to be administered,” while the 1851 Indiana Constitution used two separate sentences. Smothers, 332 Or at 114. This court also found it telling that Oregon framers decided “to reserve for a separate, independent clause the requirement of remedy by due course of law for injury to person, property, or reputation.” Id. As this court reasoned, the decision to use a “separate, independent clause” implied that the Oregon framers “regarded the remedy clause as providing substantive protection to those absolute common-law rights.” Id. at 114-15.
On reviewing the changes that Oregon framers made to the version of the remedy clause that they borrowed from the 1851 Indiana Constitution, we find that they prove *217 little about the meaning of Oregon’s remedy clause, primarily for two reasons. The first is that the Oregon framers did not change Indiana’s remedy clause by putting it into a “separate, independent clause.” The remedy clause in the 1851 Indiana Constitution already appeared in a separate, independent clause; the only deviation by the Oregon framers was that they put the clause in a different part of the sentence: in the Indiana version, it came in the middle of two sentences; in the Oregon version, it came at the end of a single sentence. Second, we doubt that the Oregon framers would transform the meaning of the clause merely by changing its location. To be clear, we are not saying that our remedy clause cases erred in concluding that the Oregon framers intended that the remedy clause would guarantee some remedial process for certain injuries. We cannot, however, infer that intent from the placement of the clause in a sentence.
8. Our remedy clause decisions
With that background in mind, we return to defendant’s argument that Article I, section 10, is merely a guarantee of equal access to the courts for whatever remedy the legislature has provided. In defendant’s view, all our remedy clause cases should be overruled because the premises on which this court based those decisions were clearly incorrect. See State v. Savastano, 354 Or 64, 95-96, 309 P3d 1083 (2013) (overruling prior cases in similar circumstances). As explained above, however, the text and the history of the remedy clause do not yield a clear answer regarding the clause’s meaning. Although state remedy clauses find their earliest source in limitations on royal authority, the state cases that preceded the adoption of Oregon’s constitution consistently viewed their state remedy clauses as placing some substantive limit on legislative authority.
Admittedly, the substantive limits that those cases found in their remedy clauses varied. Many courts viewed their remedy clauses as prohibitions on retroactive legislation that interfered with “vested rights,” an amorphous concept that often reflects a conclusion rather than a rationale. Some but not all those courts also recognized that the remedy clause permitted their legislatures to substitute a *218 less-protective remedy for the common-law one and thus, in effect, adjust the parties’ common-law rights. See Gooch, 13 Me at 376-77; Stowell, 11 Mass at 365-66. Finally, some state courts interpreted statutes to avoid a complete denial of a common-law remedy, which could have run afoul of their remedy clauses, and others explicitly stated that conclusion in the context of contract clause claims. Thorton, 11 Minn at 340; see Call, 8 Mass at 430 (explaining that, under contract clause, legislature may not deny remedy completely).
Given the cases that preceded and were contemporaneous with the adoption of Oregon’s remedy clause cases, we cannot say that our decisions, with the exception of Smothers, find no support in the text and history of that provision and should be overruled. In reaching that conclusion, we need not decide how we would interpret Oregon’s remedy clause if we were considering it for the first time. Rather, for over 100 years, this court has debated the meaning of the clause, the latitude it gives the legislature, and the rights it protects. Distilled from that debate are a series of decisions that evolved as the legislation they considered evolved. We may not toss that considered body of decisions aside, as defendant urges, nor can we conclude that the remedy clause is effectively a null set that merely replicates in a judicial context what the privileges and immunities clause guarantees more broadly. Although we overrule Smothers, we reaffirm our remedy clause decisions that preceded Smothers, including the cases that Smothers disavowed. We draw the following conclusions from those cases.
As our early cases recognized, common-law causes of action and remedies provide a baseline for measuring the extent to which subsequent legislation conforms to the basic principles of the remedy clause—ensuring the availability of a remedy for persons injured in their person, property, and reputation. As our early cases also recognized, however, the common law is not inflexible but changes to meet the changing needs of the state. Perozzi, 149 Or at 348; Re Water Rights of Hood River, 114 Or at 180-81; Peery, 93 Or at 52. For that reason, Smothers clearly erred in holding that the remedy clause locks courts and the legislature *219 into a static conception of the common law as it existed in 1857. Put differently, the remedy clause does not protect only those causes of action that pre-existed 1857, nor does it preclude the legislature from altering either common-law duties or the remedies available for a breach of those duties.
In determining the limits that the remedy clause places on the legislature, our cases have considered three general categories of legislation. First, when the legislature has not altered a duty but has denied a person injured as a result of a breach of that duty any remedy, our cases have held that the complete denial of a remedy violates the remedy clause. See Noonan, 161 Or at 222-35 (summarizing Mattson and cases following it). Similarly, our cases have held that providing an insubstantial remedy for a breach of a recognized duty also violates the remedy clause. Compare Clarke, 343 Or at 608, 610 ($200,000 capped damages not substantial in light of $12,000,000 in economic damages and $17,000,000 in total damages), with Howell, 353 Or at 376 ($200,000 capped damages substantial in light of $507,500 in total damages).
Second, the court has recognized that the reasons for the legislature’s actions can matter. For example, when the legislature has sought to adjust a person’s rights and remedies as part of a larger statutory scheme that extends benefits to some while limiting benefits to others, we have considered that quid pro quo in determining whether the reduced benefit that the legislature has provided an individual plaintiff is “substantial” in light of the overall statutory scheme. Hale, 308 Or at 523.
Third, the legislature has modified common-law duties and, on occasion, has eliminated common-law causes of action when the premises underlying those duties and causes of action have changed. In those instances, what has mattered in determining the constitutionality of the legislature’s action is the reason for the legislative change measured against the extent to which the legislature has departed from the common law. See Perozzi, 149 Or at 348. That is, we have considered, among other things, whether the common-law cause of action that was modified continues *220 to protect core interests against injury to persons, property, or reputation or whether, in light of changed conditions, the legislature permissibly could conclude that those interests no longer require the protection formerly afforded them. See Norwest, 293 Or at 563 (discussing legislative abolition of common-law torts of criminal conversation and alienation of affections).
It is difficult to reduce our remedy clause decisions to a simple formula, as Smothers sought to do, in part because the statutes that have given rise to those decisions do not reflect a single legislative goal or method of achieving that goal. In that respect, our remedy clause cases are not unlike our takings clause cases. Attempts to articulate a single unifying principle fail to comprehend the varied ways that the legislature can and has gone about achieving its goals. See Coast Range Conifers v. Board of Forestry, 339 Or 136, 146, 117 P3d 990 (2005) (rejecting plaintiffs unified theory of takings because it failed to take account of the differing “nature of the government action that gives rise to the [takings] claim”). The same is true here. As Article XVIII, section 7, recognizes, one of the functions of the legislature is to adjust the duties that one person owes another and the remedies for a breach of that duty as societal conditions change. It follows from our cases that, in deciding whether the legislature’s actions impair a person’s right to a remedy under Article I, section 10, we must consider the extent to which the legislature has departed from the common-law model measured against its reasons for doing so.
We note one final consideration regarding our remedy clause cases that have come after Smothers. To the extent that those cases turn on the bright line rule that Smothers drew (all injuries for which common-law causes of action existed in 1857 require a remedy while injures for which no cause of action existed in 1857 are entitled to no protection), then those cases must be taken with a grain of salt. That said, we agree with Clarke and Howell that the substantiality of the legislative remedy can matter in determining whether the remedy is consistent with the remedy clause. When the legislature does not limit the duty that a *221 defendant owes a plaintiff but does limit the size or nature of the remedy, the legislative remedy need not restore all the damages that the plaintiff sustained to pass constitutional muster, see Howell, 353 Or at 376, but a remedy that is only a paltry fraction of the damages that the plaintiff sustained will unlikely be sufficient, see Clarke, 343 Or at 610. It is worth noting, however, that both Clarke and Howell evaluated the plaintiffs’ Article I, section 10, claims in those cases through the lens that Smothers provided. As explained above, and as this court recognized in Hale, other factors, such as the existence of a quid pro quo, can bear on the determination.
D. Application
With that background in mind, we turn to the circumstances of this case. We note that this case falls into the second category of cases identified above; that is, the legislature did not alter the duty that OHSU doctors owe their patients to exercise due care. However, the Tort Claims Act, as amended, limits a plaintiffs remedy for a breach of that duty as part of a comprehensive statutory scheme intended to extend benefits to some persons while adjusting the benefits to others. Moreover, as explained below, the Tort Claims Act seeks to accommodate the state’s constitutionally recognized interest in sovereign immunity with a plaintiffs right to a remedy. Those factors bear on our evaluation of the sub-stantiality of the remedy that the Tort Claims Act provides.
As the trial court held and as plaintiff does not dispute, OHSU is an arm of the state and, for that reason, may invoke the doctrine of sovereign immunity. See Clarke, 343 Or at 600. This court recognized in Hale that the doctrine of sovereign immunity has constitutional underpinnings. See 308 Or at 515; Vendrell v. School District No. 26C, 226 Or 263, 278, 360 P2d 282 (1961) (“Our Constitution is framed on the premise that the state is immune from suit * * *.”). Article IV, section 24, of the Oregon Constitution assumes that the state is immune from liability for its torts, and it authorizes the state to waive that immunity by general law. Hale, 308 Or at 515. Without a valid waiver, the state may not be sued. Id. at 514 & n 5. Sovereign immunity, however, does not extend to the state’s employees. See Gearin, 110 Or *222 at 396-97 (county employees). State employees are subject to suit for their torts even though they are acting on the state’s behalf. Id.
That distinction leaves the state on the horns of a dilemma. The state acts through its employees, and many of the functions that the state undertakes on behalf of its citizens entail risks of liability that few private entities would choose to bear—guarding prisoners, policing the streets, and intervening in families to protect children from abuse, to name only a few. If the state indemnified its employees for all the liability that they incurred while acting on the state’s behalf, the state’s sovereign immunity effectively would be eviscerated. Conversely, if the state chose not to indemnify its employees for any liability that they incurred while acting on its behalf and shifted all the risk to its employees, few qualified persons would choose to work for the state.
The Tort Claims Act avoids that dilemma by waiving the state’s immunity for its torts but capping the amount for which the state can be held liable—in this case, $3,000,000. ORS 30.265(1) (waiving immunity from tort actions subject to certain limitations); ORS 30.271(3) (listing graduated limits on state liability). The Tort Claims Act indemnifies state employees for liability in tort for acts occurring in the performance of their public duty but caps the amount of their liability at the amount for which the state has waived its sovereign immunity. ORS 30.285(1), (6). In so doing, the Tort Claims Act accommodates the state’s constitutionally recognized interest in asserting its sovereign immunity with the need to indemnify its employees for liability that they incur in carrying out state functions.
Moreover, the Tort Claims Act gives plaintiffs something that they would not have had if the state had not partially waived its immunity. The act ensures that a solvent defendant will be available to pay any damages up to $3,000,000—an assurance that would not be present if the only person left to pay an injured person’s damages were an uninsured, judgment-proof state employee. Compare Mattson, 39 Or at 580 (recognizing that legislature could immunize cities consistently with Article I, section 10, as long as the injured plaintiff has a remedy against a city *223 employee), with Eastman, 32 F at 34 (“If travelers and others who sustain injuries by reason of defective highways can have no remedy against any one except these officers personally, they might as well have none.”). There is, in short, a quid pro quo.
In setting the cap on state liability, the 2009 legislature recognized that the then-existing tort claims limit of $200,000 was vastly inadequate. In determining a more equitable limit, the legislature considered actuarial data about the impact of unlimited recoveries on public bodies and the impact of different levels of caps. Testimony, Senate Committee on Judiciary, SB 311, Jan 22, 2009, Ex 5 (statement of Kris Kautz). It also studied tort claims caps in other states. Id. And it considered data from the last few decades of claims brought under the Oregon Tort Claims Act. After considering that data, the legislature set new limits for claims against state and local government bodies, increasing the single-claim cap for claims against the state and OHSU from $200,000 to $1.5 million and the aggregate cap to $3 million.[26] Or Laws 2009, ch 67, §§ 3, 4. It provided for yearly increases to the caps according to a fixed percentage indexed to inflation. In 2011, the legislature amended the Tort Claims Act to allow plaintiffs to proceed directly against a named individual when the complaint alleged damages in excess of the Tort Claims Act limit. Or Laws 2011, ch 270, § 1. The public body, however, would still be obligated to indemnify the individual employee, although the overall Tort Claims Act limit would apply to the amount of recovery. Id.
The legislature recognized that the increased damages available under the revised Tort Claims Act would not provide a complete recovery to everyone injured as a result of the state’s tortious acts. However, those increased limits provide a complete recovery in many cases, greatly expand the state’s liability in the most egregious cases, and advance the purposes underlying the doctrine of sovereign immunity *224 while ensuring that a solvent defendant is available to pay a plaintiffs damages up to the amount of the Tort Claims Act limit. Given the legislature’s efforts to accommodate the state’s constitutionally recognized interest in sovereign immunity and a plaintiffs constitutional right to a remedy, we cannot say that the $3,000,000 tort claims limit on damages against state employees is insubstantial in light of the overall statutory scheme, which extends an assurance of benefits to some while limiting benefits to others. See Hale, 308 Or at 523,[27] cf. Davidson v. Rogers, 281 Or 219, 224-25, 574 P2d 624 (1978) (Linde, J., concurring) (construing Article I, sections 8 and 10, together in determining whether right to demand retraction permissibly limits damages in defamation action).
We recognize that the damages available under the Tort Claims Act are not sufficient in this case to compensate plaintiff for the full extent of the injuries that her son suffered. However, our remedy clause cases do not deny the legislature authority to adjust, within constitutional limits, the duties and remedies that one person owes another. That is particularly true when the legislature seeks to accommodate the state’s constitutionally recognized interest in sovereign immunity and a plaintiffs constitutionally protected right to a remedy and when the remedy that the legislature has provided “represents a far more substantial remedy than the paltry fraction that remained after the imposition of the limitation in Clarke.” Howell, 353 Or at 376.[28]
*225 Our holding today is limited to the circumstances that this case presents, and it turns on the presence of the state’s constitutionally recognized interest in sovereign immunity, the quid pro quo that the Tort Claims Act provides, and the tort claims limits in this case. We express no opinion on whether other types of damages caps, which do not implicate the state’s constitutionally recognized interest in sovereign immunity and which are not part of a similar quid pro quo, comply with Article I, section 10. Those cases are not before us, and we leave their resolution to the customary process of case-by-case adjudication.
II. ARTICLE I, SECTION 17
Following Lakin v. Senco Products, Inc., 329 Or 62, 987 P2d 463, modified, 329 Or 369, 987 P2d 476 (1999), the trial court held that applying the Tort Claims Act limit to the jury’s damages award violated Article I, section 17. On appeal, defendant does not dispute that, if Lakin is good law, the trial court’s judgment should be affirmed. He argues, however, that subsequent cases have undercut the premises on which Lakin rests, and he contends that a reexamination of the text of Article I, section 17, its history, and the cases interpreting it demonstrates that Lakin was wrongly decided and should be overruled. Plaintiff responds that “Lakin is built on a solid foundation of constitutional history and analysis, and well-established precedent.”[29] She observes that, since it was decided in 1999, “Lakin has been applied in several cases, most recently by this court in Klutschkowski,” and she reasons that defendant has not met the difficult task of persuading this court that it should overrule one of its precedents. In evaluating the parties’ arguments, we begin with defendant’s argument that our cases since Lakin have eroded the premises on which that decision rests.
*226 A. Lakin and subsequent Article I, section 17, cases
Article I, section 17, provides: “In all civil cases the right of Trial by Jury shall remain inviolate.” In interpreting that section, most of this court’s cases have sought to determine, as a procedural matter, which claims or defenses will entitle a party to a jury trial. See, e.g., McDowell Welding & Pipefitting v. US Gypsum Co., 345 Or 272, 279, 193 P3d 9 (2008); Deane v. Willamette Bridge Co., 22 Or 167 (1892); Tribou v. Strowbridge, 7 Or 156 (1879). On that procedural issue, the court consistently has held that Article I, section 17, does not give a party a right to a jury trial for claims or defenses that would have been tried to a court of equity in 1857 when the Oregon Constitution was adopted. McDowell, 345 Or at 279; Deane, 22 Or at 169-70; Tribou, 7 Or at 158. Conversely, the court consistently has recognized that Article I, section 17, guarantees a jury trial in those cases in which the right to a jury trial was customary at the time the Oregon Constitution was adopted and in cases of like nature. See M. K. F. v. Miramontes, 352 Or 401, 413, 287 P3d 1045 (2012) (state constitutional jury trial right extends to new causes of action that are “of like nature” to claims and defenses that would have been tried to a jury in 1857).
In 1995, this court addressed, for the first time, whether Article I, section 17, guarantees a substantive as well as a procedural right; that is, this court addressed whether, in addition to guaranteeing a procedural right to have a jury rather than a judge decide the facts in certain kinds of civil cases, Article I, section 17, also restricts the legislature’s ability to limit the type or amount of damages that a jury awards. See Greist v. Phillips, 322 Or 281, 293-95, 906 P2d 789 (1995). Greist held that it does not; more specifically, Greist held that the legislature may limit a jury’s damages award in wrongful death actions. The court based that holding on two separate grounds.
The court explained initially that, because the common law did not recognize a claim for wrongful death in 1857, Article I, section 17, did not apply to that claim. Id. at 294. Alternatively, the court explained that, before 1910, Oregon trial courts applied the doctrine of remittitur *227 to reduce jury damages awards if they were excessive. Id. at 294-95. Relying on that practice, this court rejected the plaintiffs argument that, in 1857, a party would have had “a right to have a judge enter judgment on a jury’s award of damages—without judicial alteration—in a personal injury action.” Id. at 295. As a consequence, the court declined to find that Article I, section 17, included a substantive limit on the legislature’s authority to cap non-economic damages.
Four years later, this court took a different course in Lakin. It viewed Greist’s resolution of the plaintiffs Article I, section 17, claim as resting on the first ground identified in Greist—that Article I, section 17, does not apply to wrongful death actions because that action was not recognized by the common law in 1857. Lakin, 329 Or at 77. Lakin described the alternative ground in Greist—that the practice of remittitur before 1910 established that Article I, section 17, does not impose a substantive limitation on the legislature—as dicta, which “require [d] correction.” Id. at 76. We discuss Lakin’s reasoning in greater detail below, but essentially Lakin held that Greist’s discussion of remittitur was erroneous because “Oregon trial courts never have had the power to reduce a jury’s verdict or enter judgment for a lesser amount of damages over the objection of the prevailing party, who always could reject a judicial remittitur and demand a new jury trial.” Id. Lakin concluded that, because a trial court could not unilaterally reduce a jury’s damages award, neither could the legislature. Id. at 78-79.
Since Lakin, we have distinguished or limited Lakin’s holding in four decisions: Jensen v. Whitlow, 334 Or 412, 51 P3d 599 (2002); DeMendoza v. Huffman, 334 Or 425, 51 P3d 1232 (2002); Lawson v. Hoke, 339 Or 253, 119 P3d 210 (2005); and Hughes v. PeaceHealth, 344 Or 142, 178 P3d 225 (2008). We followed Lakin once in Klutschkowski.[30] *228 We discuss those decisions briefly in considering whether our cases have eroded the premises on which Lakin rested and whether, as a result, it is appropriate to reexamine the sources on which Lakin based its holding. See Couey, 357 Or at 486-87 (reconsidering decisions that cannot be fairly reconciled with each other).
1. Jensen
In Jensen, the court rejected the plaintiffs claim that eliminating a cause of action against a public employee who had injured the plaintiffs child violated Article I, section 17. The court reasoned:
“Article I, section 17, is not a source of law that creates or retains a substantive claim or theory of recovery in favor of any party. Instead, as this court previously has held, Article I, section 17, simply ‘guarantees a jury trial in civil actions for which the common law provided a jury trial when the Oregon Constitution was adopted in 1857.”’
Jensen, 334 Or at 422 (quoting Lakin, 329 Or at 82). Jensen distinguished Lakin on the ground that Article I, section 17, does not put a substantive limit on the legislature’s authority to eliminate a cause of action. The court explained that, if the plaintiff had a remedy for eliminating a cause of action, it arose from some constitutional provision other than Article I, section 17.
2. DeMendoza
The court extended its reasoning in Jensen to a related but separate issue in DeMendoza. The statute at issue in DeMendoza directed that 60 percent of the punitive damages that the jury awarded to a party be distributed to the state. The plaintiffs in DeMendoza argued that the statute violated both Article I, section 10, and Article I, section 17. This court first held that the plaintiffs had no substantive right under Article I, section 10, to recover punitive damages. DeMendoza, 334 Or at 446. It then turned to the plaintiffs’ argument that, under Lakin, the statute redistributing part of their punitive damages award was no different from a damages cap because it prevented the plaintiffs from receiving the full amount of the punitive damages that the jury had awarded them.
*229 In analyzing the plaintiffs’ Article I, section 17, claim, the court first quoted Jensen for the proposition that “‘Article I, section 17, is not a source of law that creates or retains a substantive claim or a theory of recovery in favor or any party.’” Id. (quoting Jensen, 334 Or at 422) (emphasis deleted). It then explained, “ [likewise, if a ‘right’ to receive an award that reflects the jury’s determination of the [full] amount of punitive damages exists, then it must arise from some source other than Article I, section 17.”[31] Id. at 447. DeMendoza thus held that, if the plaintiffs’ right to receive the full amount of the punitive damages that the jury awarded did not arise from some other state or federal constitutional provision, such as Article I, section 10, then the plaintiffs had no additional right under Article I, section 17, to receive the full amount of the jury’s punitive damages award.
DeMendoza possibly can be reconciled with Lakin in one of two ways. DeMendoza may have sought to distinguish Lakin on the ground that Lakin involved a reduction in compensatory damages while DeMendoza involved a reduction in punitive damages. See id. (noting Lakin’s statement that the noneconomic damages cap in that case interfered with the plaintiffs’ right to receive the full amount of compensatory damages awarded). We hesitate, however, to conclude that DeMendoza sought to distinguish Lakin on *230 that ground. This court has long recognized that, for the purposes of the state constitutional right to a jury trial, “no valid distinction * * * can be drawn between compensatory and exemplary damages.” Van Lom v. Schneiderman, 187 Or 89, 110, 210 P2d 461 (1949). As a matter of state constitutional law, both are factual issues for the jury. Oberg v. Honda Motor Co., 316 Or 263, 275 n 7, 851 P2d 1084 (1993), rev’d and remanded on other grounds, Honda Motor Co. v. Oberg, 512 US 415, 114 S Ct 2331, 129 L Ed 2d 336 (1994); Van Lom, 187 Or at 110-13.
Beyond that, Lakin posed the question before it broadly as “whether the assessment of damages was a function of a common-law jury in 1857.” 329 Or at 72. Phrasing the issue that way suggests that, consistently with Van Lom and Oberg, the court in Lakin did not intend to limit its holding to legislative reductions in compensatory damages awarded by the jury. It follows, we think, that Lakin cannot fairly be reconciled with DeMendoza on the ground that the former involved a reduction in an award of compensatory damages while the latter involved a reduction in an award of punitive damages.
Perhaps DeMendoza can be reconciled with Lakin another way. As noted, DeMendoza first held that the remedy clause of Article I, section 10, placed no limit on the legislature’s authority to reduce or eliminate punitive damages. 334 Or at 445-46. Relying on Jensen, DeMendoza then explained that, because the “plaintiffs have no underlying 'right to receive an award’ that reflects the jury’s determination of the amount of punitive damages, * * * the legislature’s allocation of a portion of the punitive damages award to the state does not implicate Article I, section 17.” 334 Or at 447. One way potentially to reconcile Lakin and DeMendoza’s Article I, section 17, holdings is that, in one, the remedy clause placed no restriction on the legislature’s authority to limit punitive damages while, in the other, the remedy clause restricted the legislature’s authority to limit compensatory damages. That is, neither case may have viewed Article I, section 17, as providing an independent right to retain all the damages that a jury awards, and the difference may have turned on the presence or absence of a right under Article I, section 10.
*231 The difficulty with attempting to reconcile DeMendoza and Lakin that way is that Lakin expressly held that the plaintiffs in that case had a right to receive the full amount of the jury’s compensatory damages award under Article I, section 17, even if they did not have a right to do so under Article I, section 10. Lakin, 329 Or at 80-81. That is, Lakin’s reasoning explicitly negates the proposition that its holding can be reconciled with DeMendoza on the ground that Article I, section 10, places a substantive limit on the legislature’s right to reduce compensatory damages but not punitive damages. In our view, the court’s decision in DeMendoza is a reasonable extension of its decision in Jensen, but DeMendoza cannot be fairly reconciled with Lakin.
3. Hughes
Hughes poses a similar problem, even though Hughes rests on a distinction that Lakin itself drew in overruling part of Greist. As noted, Greist had held that Article I, section 17, does not prevent the legislature from capping a jury’s award of noneconomic damages in wrongful death cases for two reasons: (1) the practice of remittitur in 1857 was at odds with that argument and (2) a wrongful death action did not exist at common law in 1857 and thus was not subject to Article I, section 17. Greist, 322 Or at 294-95. In holding that Article I, section 17, prevents the legislature from limiting damages in a negligence action, Lakin rejected the first ground noted in Greist but not the second. Lakin, 329 Or at 77. That is, Lakin reconciled its holding with Greist by explaining that Greist involved a wrongful death action, which was not recognized by the common law in 1857. Id. By contrast, at least one of the claims in Lakin was recognized by the common law in 1857. Id.
Noting Lakin’s implicit acceptance of the second ground in Greist, this court held in Hughes that the legislature could limit the jury’s award of noneconomic damages in wrongful death actions because that action did not exist in 1857. Hughes, 344 Or at 154. In doing so, Hughes rejected the plaintiffs argument that Article I, section 17, applies not only to claims that existed at common law but also to claims “of like nature.” Id. at 155. The court did not dispute that the plaintiffs wrongful death claim in Hughes was “of like *232 nature” to a negligence claim, which would have been tried to a jury at common law. However, relying on Jensen and DeMendoza, the court explained that Article I, section 17, is not a source of law that creates a substantive right to non-economic damages. Id. Only if the claim was recognized in 1857 would the jury’s verdict be immune from reduction.[32] Id.
Two justices dissented in Hughes. One of the dissents reasoned that the majority’s holding in Hughes "subvert [ed]” the fundamental principle that underlies Lakin— “that the right to jury trial is a right of substance with which the legislature cannot interfere.” Id. at 174 (Walters, J., dissenting). The other dissent explained that the majority opinion “t[ook] several odd steps that do not withstand scrutiny.” Id. at 171 (Durham, J., dissenting). Both dissents faulted the majority for holding that Article I, section 17, applied only to common-law claims that were recognized in 1857, but not to claims of like nature.
4. Miramontes
Later, in Miramontes, the court considered an issue that had not been presented in Hughes—whether a party was entitled to have a jury rather than a judge decide a claim that had not existed in 1857 but was “of like nature” to claims that were tried to a jury then.[33] The trial court in Miramontes had refused to empanel a jury to decide a damages claim against a defendant in a stalking case. 352 Or at 403. The court held that, even though the plaintiffs damages claim in that case was unknown to the common law in 1857, Article I, section 17, gave the defendant the right to try *233 that claim to a jury because the claim was “of like nature” to one that would have been tried to a jury in 1857. Id. at 413-14.
At first blush, Hughes and Miramontes appear to conflict. One limits Article I, section 17, to claims that would have been tried to a jury in 1857; the other extends the right to claims “of like nature.” One way to reconcile those two cases is to say that they bifurcated the Article I, section 17, jury trial right into substantive and procedural components. The substantive component of Article I, section 17, extends only to those common-law claims that existed in 1857, and the damages that a jury awards for those claims may not be reduced. By contrast, the procedural component extends to all claims that are “of like nature” to common-law claims that existed in 1857, but the procedural component guarantees only the right to have a jury, as opposed to a judge, decide those claims. That resolution—dividing the jury trial right into two components and attributing different legal consequences to each—alleviates some of the tension between Hughes and Miramontes, but it does not resolve the underlying conflict—whether the premises on which Article I, section 17, rests support bifurcating the right.[34]
5. Klutschkowski
This court followed Lakirís holding in one case— Klutschkowski. The primary dispute in that case was whether an infant’s claim for negligently inflicted injuries that occurred during the infant’s birth would have been actionable in 1857. See Klutschlowski, 354 Or at 168-69. The court held that the claim would have been and, having reached that conclusion, determined that the plaintiffs claim came within Lakirís holding. Id. at 176-77. In *234 both Lakin and Klutschkowski, the plaintiff was seeking to recover for an injury for which the common law would have provided a remedy in 1857. Id.
Admittedly, the fact that Klutschkowski was virtually identical to Lakin in that respect did not resolve the conflict between Lakin, on the one hand, and DeMendoza, on the other, nor did it resolve the tension between Hughes and Miramontes. However, the parties in Klutshckowski did not ask the court to reconsider or reconcile its precedents. Id. at 169. The court accordingly did not do so. Rather, it looked to the most applicable precedent, which was Lakin, and resolved the case on that ground. Klutschkowski accordingly did not address the issue that this case presents.
Given our cases, it is difficult to describe Lakin as either “settled” or “well-established” precedent. This court has distinguished Lakin in all the cases that came after it, with the exception of Klutschkowski where the defendant declined to challenge it. Some of the cases distinguishing Lakin can fairly be reconciled with it. Others, such as DeMendoza, cannot. And while Hughes relies on a distinction that Lakin itself recognized, the dissenting opinions in Hughes reasoned, with some force, that the distinction that Lakin drew and that Hughes followed “subverted” what they viewed as the fundamental premise of Lakin. See Hughes, 344 Or at 174 (Walters, J., dissenting). Given the disarray among our Article I, section 17, cases, we conclude that it is appropriate to reconsider Lakin’s holding. See Couey, 357 Or at 489 (explaining that, when two of this court’s decisions cannot be fairly reconciled, it is appropriate to reconsider which decision fits more closely with the constitutional text and history). We accordingly reexamine Article I, section 17's text and history.
B. Text
As noted, Article I, section 17, provides: “In all civil cases the right of Trial by Jury shall remain inviolate.” In Lakin, the court explained that the word “inviolate” (and we would add the word “remain”) suggests that the framers intended to preserve the “right of Trial by Jury” as it existed in 1857. 329 Or at 69. We agree with that proposition, as have *235 a long line of Oregon cases interpreting Article I, section 17. See Deane, 22 Or at 169-70 (Article I, section 17, “secures * * * the right to trial by jury in all cases where that right existed at the time the constitution was adopted.”); Tribou, 7 Or at 158 (same). We also agree with Lakin that saying that the framers intended to preserve the “right of Trial by Jury” does not answer the question of what that right encompasses. Lakin, 329 Or at 69. Perhaps a textual clue can be drawn from the use of the prepositional phrase “by Jury.” That phrase defines the type of trial that Article I, section 17, preserves. It suggests that the right that Article I, section 17, preserves is a right to a procedure (a trial by a jury as opposed to a trial by a judge) rather than a substantive result. However, we agree with Lakin that the text of Article I, section 17, standing alone, does not definitively answer the question one way or another.[35]
C. History
We also consider the history that surrounded the adoption of Article I, section 17, to determine the scope of the right that the framers intended to preserve. On that point, Lakin observed that the right to a jury trial in civil cases has deep roots. Lakin explained that “the guarantee of [a civil] trial by jury was ensured in the Magna Carta in 1215,” that it was described by Blackstone as “‘the glory of the English law’” and ‘“the most transcendent privilege that any subject can enjoy,”’ and that the majority of the state constitutions leading up to the adoption of Oregon’s constitution in 1857 included the right. See 329 Or at 70-71 (quoting Dimick v. Schiedt, 293 US 474, 485-86, 55 S Ct 296, 79 L Ed 603 (1935)).
*236 We agree that the right to a jury trial in civil cases was attributed, at least popularly, to Magna Carta,[36] that, approximately 500 years after Magna Carta was signed, Blackstone described the civil jury trial as an essential attribute of the liberty that English citizens enjoyed, and that that view of the right continued in America with the result that its omission from the federal constitution was one of the major objections raised against ratifying the constitution as it emerged from the Constitutional Convention.
To say, however, that the right was viewed as an essential attribute of liberty does not say what the right encompasses. In considering that issue, we begin with Blackstone, whose writing on the civil jury trial was influential in shaping American thought on that issue. See Charles W. Wolfram, The Constitutional History of the Seventh Amendment, 57 Minn L Rev 639, 654 n 45 (1973) (discussing Blackstone’s influence). In concluding that the right to a civil jury trial was “the glory of the English law,” Blackstone first described the attributes of a civil jury trial and then discussed its structural significance. William Blackstone, 3 Commentaries on the Laws of England 349-67, 372-81, 383-85 (1st ed 1768).
In describing the attributes of the right, Blackstone focused solely on the procedures associated with jury trials. He explained that the system for selecting both jury panels and individual jurors was designed to ensure a group of neutral jurors. Id. at 355-56 (procedures for calling jurors); id. at 359-65 (grounds for challenging jury panels and individual jurors). He also contrasted a civil jury trial with a trial by the ecclesiastical courts. Id. at 372-73. In doing so, he praised not only the value of having neutral jurors decide the facts but also the procedural rights that accompany a jury trial, such as the right to cross-examination and the right to have witnesses testify under oath in open court. Id. He contrasted those procedural rights, which he associated with civil jury trials, with the procedures *237 available in the ecclesiastical courts, which he described as the “private and secret examination taken down in writing before an officer, or his clerk.” Id. at 373. He explained that, in the ecclesiastical courts, “an artful or careless scribe may make a witness speak what he never meant,” while a witness who testifies in open court can clarify his or her meaning, answer occasional questions from the judge or jury, and is subject to cross-examination, which “will sift out truth much better than a formal set of interrogatories.” Id.
In explaining the structural significance of civil jury trials, Blackstone focused on the division of authority between judges and jurors. He reasoned that, if law and fact were “entirely entrusted to the magistracy, a select body of men [chosen by the prince], their decisions, in spight [sic] of their own natural integrity, will have frequently an involuntary biass [sic] towards those of their own rank and dignity.” Id. at 379. Conversely, “if the power of judicature were placed at random [and wholly] in the hands of the multitude, their decisions would be wild and capricious, and a new rule of action would be every day established in our courts.” Id. at 379-80.
Dividing issues of law and fact between the judges and juries avoided those extremes. Blackstone reasoned that the “principles and axioms of law, which are general propositions, flowing from abstracted reason, and not accommodated to times or to men, should be deposited in the breasts of the judges.”[37] Id. at 380. However, entrusting factual questions to a single magistrate left too much possibility that a judge would drift towards “partiality and injustice.” Id. In Blackstone’s view, “a competent number of sensible and upright jurymen, chosen by lot from among those of the middle rank, will be found the best investigators of truth.” Id. Moreover, “the most powerful individual in the state will be cautious of committing any flagrant invasion of another’s right, when he knows that the fact of his oppression must *238 be examined and decided by twelve indifferent men ***; and that, when once the fact is ascertained, the law must of course redress it.” Id. It followed, he concluded, that the civil jury system “preserves in the hands of the people that share which they ought to have in the administration of public justice, and prevents the encroachments of the more powerful and wealthy citizens.” Id.
In focusing on the procedural benefits of civil jury trials, Blackstone did not suggest that the right to a civil jury imposed a substantive limit on the ability of either the common-law courts or parliament to define the legal principles that create and limit a person’s liability. Similarly, in describing the division of authority between judges and juries, he did not state that the jury trial right checked the lawmaking authority of either the common-law courts or parliament. Rather, he explained that courts retain the authority to define the applicable legal principles.
Only one statement that Blackstone made in his discussion of the value of a civil jury arguably points in a different direction. As noted, Blackstone explained that a civil jury trial was valuable because the most powerful members of society would be aware that their actions could “be examined and decided by twelve indifferent men ***; and that, once the fact is ascertained, the law must of course redress it.” Id. at 380. That statement—-that the law would redress the facts found by the jury—reflected Blackstone’s view of the way that the law, announced by parliament and the common-law courts, worked. It did not reflect an understanding that the jury’s fact-finding ability imposed a substantive limitation on parliament or common-law courts’ authority to announce legal principles that guide and limit the jury’s fact-finding function.
The same conclusion follows from the American experience. Before the adoption of the federal constitution, the 13 original states provided for jury trials subject to varying degrees to judicial control. See Edith Guild Henderson, The Background of the Seventh Amendment, 80 Harv L Rev 289, 318-20 (1966) (describing the “patternless diversity of these jury control practices [among the original states] at the *239 time the seventh amendment was passed”).[38] As Henderson describes, the states differed on the degree to which judges could limit a jury’s fact-finding authority. However, she did not identify any substantive limitation among the original states that the right to a civil jury placed on a state legislature’s ability to define civil causes of action or damages.
Similarly, before the revolution, one issue that divided the colonies from England was “the extent to which colonial administrators were making use of judge-tried cases to circumvent the right of civil jury trial.” Wolfram, Seventh Amendment, 57 Minn L Rev at 654. George Mason, for example, “asserted that threats to the accepted practice of trial by jury and injustices perpetrated by the vice-admiralty courts had become points of dispute between the American colonies and England.” Id. at 654 n 47. In the same vein, John Peter Zenger’s libel case became famous, in part because he had criticized New York’s colonial governor for attempting to recover a debt in an equity court in order to evade the debtor’s right to a civil jury trial. Id. at 655. The concern that Mason expressed and that Zenger’s case reflected was that decision-making authority was being improperly shifted from a jury composed of American citizens to a judge who was beholden to a British monarch. The perceived value of a civil jury trial lay in the jury’s ability to provide a fair application of the law to the facts in an individual case, not in any substantive limitation that the civil jury trial placed on the legislature’s lawmaking authority.
Despite the value that the colonists placed on having a jury rather than a colonial judge decide civil claims, the Constitutional Convention did not include a civil jury trial guarantee in the constitution, although the convention did guarantee a jury trial in criminal cases. See US Const, Art III, § 2.[39] The absence of a civil jury trial guarantee in *240 the constitution was not mentioned until five days before the Constitutional Convention adjourned. At that point, Hugh Williamson, a delegate from North Carolina, “observed *** that no provision was yet made for juries in Civil cases and suggested the necessity of it.” 2 The Records of the Federal Convention of 1787, at 587-88 (Max Farrand ed., 1911). Elbridge Gerry agreed and “urged the necessity of Juries to guard agst. corrupt Judges.” Id. In response, Nathaniel Gorham explained that “[i]t is not possible to discriminate equity cases from those [cases] in which juries are proper,” and he argued that the question of which civil cases should be tried to a jury and which should be tried to a judge should be left to Congress. Id. Still another representative held out the possibility that each state’s procedures governing civil juries would apply in the federal court sitting in that state. Id.
Those objections to adding a civil jury trial guarantee to the constitution prevailed. Williamson’s suggestion to add a civil jury trial guarantee was defeated, as was a motion three days later to add the following guarantee to Article III, section 2, paragraph 3, of the federal constitution: “And a trial by jury shall be preserved as usual in civil cases.” Id. at 587-88, 628.
When the states were deciding whether to ratify the constitution, one of the primary objections to the federal constitution was that it lacked a bill of rights, including a right to a civil jury trial in the federal courts. See The Federalist No. 83, at 558 (Alexander Hamilton) (Jacob E. Cooke ed., 1961) (addressing that concern); Wolfram, Seventh Amendment, 57 Minn L Rev at 667. One argument was that by providing for jury trials in criminal but not civil cases, the constitution had, sub silentio, eliminated a right to civil jury trials in the federal courts. See The Federalist No. 83, at 558-59. Hamilton explained, however, that the constitution did not prohibit the use of civil juries in federal court but instead had left it to Congress to decide in which class of civil cases jury trials should be available. Id. at 559-60. In Hamilton’s view, the strongest argument for guaranteeing a right to a civil jury trial was to check biased or corrupt judges. Id. at 563-64. However, he suggested that that check was needed more forjudges appointed by a hereditary monarch than for *241 judges appointed by a popularly elected executive and confirmed by the Senate. Id. at 562.
For the most part, Hamilton defended the absence of a civil jury guarantee on the ground that Gorham had raised in the Constitutional Convention. The practice among the states was too diverse to settle on a single principle for specifying when the right would attach, and it would be impolitic to choose the practice of one of the 13 states and impose it on the other states. Id. at 564-65. Accordingly, Hamilton explained, the better course was the one that the Constitutional Convention had chosen—leaving it to Congress to define which class of civil cases should be tried to a jury and which should be tried to a judge. Id.
Hamilton’s discussion of a right to a civil jury trial in The Federalist No. 83 bears on the issue that Lakin decided in two respects. First, the arguments for and against including a civil jury trial guarantee that Hamilton canvassed all addressed the jury’s value as a procedural corrective to potentially biased or, worse, corrupt judges serving as the triers of fact. Those arguments do not suggest that the right was viewed as a substantive limit on Congress’s lawmaking power. Second, Hamilton made that point expressly in responding to an argument “that trial by jury [serves as] a safeguard against an oppressive exercise of the power of taxation.” Id. at 563. In addressing that argument, Hamilton explained that the right to a civil jury placed no limit on the legislature’s power to define the substantive law. Id. He reasoned:
“It is evident that [the right to a civil jury trial] can have no influence upon the legislature, in regard to the amount of the taxes to be laid, to the objects upon which they are imposed, or to the rule by which they are to be apportioned.”
Id. (emphases in original). He explained that, if the right to a jury trial had any effect on “an oppressive exercise of the power of taxation,” it lay in curbing “the mode of collection, and the conduct of the officers entrusted with the execution of the revenue laws.” Id. Stated differently, Hamilton explained that the right to a civil jury trial would not limit Congress’s ability to enact statutes defining the subjects and extent of taxation. Instead, it could serve as a check on *242 the manner in which the executive carried out the law in an individual case.[40]
Despite Hamilton’s arguments against including a civil jury trial right in the federal constitution, the anti-federalists’ objections to the right’s omission “struck a very responsive chord in the public” and ultimately carried the day. Wolfram, Seventh Amendment, 57 Minn L Rev at 668. Wolfram explains that the antifederalists’ objections were not based solely on the ground that juries would be more accurate than judges. Rather, examining the speeches in the state ratifying conventions, Wolfram concluded that the speakers intimated, although they never expressly stated, that juries would provide American debtors greater relief from British creditors than federal judges would. See id. at 673-705 (canvassing objections in the ratifying conventions to the absence of a civil jury guarantee). That intimation did not reflect a belief that the right to a civil jury trial would impose a substantive limitation on legislatures. Rather, it reflected the belief that, in an individual case, a jury might adjudicate the facts in a way that would favor local interests over foreign ones.
After the states ratified the constitution and Congress took up the Bill of Rights, an 11-person committee proposed the essence of what became the Seventh Amendment. 1 Annals of Cong. 85 (1789) (Joseph Gales ed., 1834). Specifically, they modified a proposal that James Madison had made to provide, in part: “In suits at common law, the right of trial by jury shall be preserved.” Id. at 86. A further amendment was made to limit the right to suits at common law in excess of $20, and the proposal, as amended, was adopted without recorded discussion. Id.[41] *243 For all that appears from the record of Congress’s action, no one raised the objection, which had been successful in the Constitutional Convention, that, given the diverse practice among the 13 states, a standard that “preserved” the right of trial by jury would have no clear meaning. Twenty-one years after the Seventh Amendment was ratified, Justice Story addressed that issue. He explained that the right of trial by jury that the Seventh Amendment preserved was the right defined by the English common law. See United States v. Wonson, 28 F Cas 745, 750 (CCD Mass 1812) (No. 16,750) (“Beyond all question, the common law here alluded to is not the common law of any individual state, (for it probably differs in all), but it is the common law of England, the grand reservoir of all our jurisprudence.”).
As this court noted in Lakin, since the adoption of the Seventh Amendment, most states have included a civil jury trial right in their state constitutions. 329 Or at 71. As the court also noted, Oregon modeled its guarantee in Article I, section 17, on the guarantee in Indiana’s constitution and adopted that guarantee without discussion. It follows that the relevant history of Article I, section 17, comes primarily from the English practice reflected in Blackstone’s Commentaries and the history leading up to and surrounding the adoption of the Seventh Amendment. That history reveals what the text of that provision implies and what this court consistently had recognized until Lakin: Article I, section 17, guarantees a procedural right; that is, it guarantees the right to a trial by a jury (as opposed to a trial by a judge) in civil actions for which the common law provided a jury trial when the Oregon Constitution was adopted in 1857 and in cases of like nature.[42] However, the history does not suggest that Article I, section 17, limits the legislature’s authority to define, as a matter of law, the substantive elements of a cause of action or the extent to which damages will be available in that action. As this court explained in DeMendoza, any substantive limit on the legislature’s authority must be found in some other provision of the state or federal constitutions.
*244 D. Lakin reconsidered
Lakin departed from that history, and we consider briefly its reasons for doing so. The court’s holding in Lakin may rest on one of three propositions. First, Lakin concluded that the right to a jury trial guaranteed by Article I, section 17, has the same meaning today that it had in 1857. 329 Or at 72. Second, the court concluded that, in 1857, the extent of a party’s damages in an individual case was a question of fact for the jury and that the legislature could not interfere with the jury’s fact-finding function. Id. at 74. Third, Lakin concluded that the legislature’s authority to limit a jury’s factual findings is no greater than a trial court’s. Id. at 78. Lakin reasoned that, although a trial court had the authority to set aside a jury’s verdict in 1857 if the jury’s verdict was contrary to the weight of the evidence, the court could do so only if it gave the party that had obtained the verdict the option of a new trial. It followed, Lakin reasoned, that neither a trial court nor the legislature could unilaterally limit a jury’s award of noneconomic damages in “civil cases in which the right to jury trial was customary in 1857, or in cases of like nature.” Id.
We take the court’s last point first. That a judge cannot reweigh the amount of damages that the jury awards in an individual case does not mean that the legislature cannot enact a statute that specifies, as a matter of law, the nature and extent of damages that are available in a class of cases. Whatever other constitutional issues a damages cap may present, a damages cap does not reflect a legislative attempt to determine a fact in an individual case or to reweigh the jury’s factual findings. Rather, a statutory cap is a legal limit on damages that applies generally in a class of cases. The fact that, in 1857, remittitur did not permit a trial court to unilaterally substitute its view of the evidence for the jury’s in an individual case does not mean that the legislature cannot define, as a matter of law, the nature and extent of damages that are generally available in a class of cases.
The second conclusion on which Lakin rests also does not withstand scrutiny. It is certainly true that the amount of damages that a party sustains is ordinarily a *245 factual issue for the trier of fact. It does not follow, however, that a trier of fact has free rein to determine the amount of a party’s damages, unconstrained by legal limits. Rather, common-law courts routinely have imposed legal limits on the type and amount of recoverable damages that a defendant’s negligence, in fact, caused. See W. Page Keeton et al., Prosser and Keeton on the Law of Torts 280-90 (5th ed 1984) (discussing limits on damages caused in fact by defendants’ negligence). Sometimes, courts have limited the extent of a defendant’s damages by limiting the class of persons to whom the defendant owes a duty. See id. at 284-85 (discussing that means of limiting damages); Hale v. Groce, 304 Or 281, 284, 744 P2d 1289 (1987) (when defendant’s negligence causes only economic harm, damages limited to persons to whom defendant owed duty). Other times, courts have used concepts such as proximate cause to limit the extent of the damages for which a defendant can be held responsible. Prosser and Keeton on the Law of Torts at 282-83.[43] More modernly, in Oregon, defendants ordinarily will be liable only for the foreseeable damages that their negligence caused. See Fazzolari v. Portland School Dist. No. 1J, 303 Or 1, 17, 734 P2d 1326 (1987).
Those differing formulations should not obscure the fact that legal limits on a jury’s assessment of civil damages have been and remain an accepted feature of our law. To be sure, statutory damages caps differ from other types of legal limitations on a jury’s authority to award damages. They specify, as a matter of law, a numerical limit on the amount of damages that a party can recover instead of describing that limit generically by using a phrase such as foreseeable damages or damages proximately caused by the defendant’s act. However, the two types of limitations do not differ in principle. Each limits, as a matter of law, the extent of the damages that a jury can award in a class of cases. One is no more an interference with the jury’s fact-finding function than the other. Neither is an attempt to determine legislatively or judicially in an individual *246 case the amount of damages that the defendant’s act in fact caused. For that reason, we disagree with the second conclusion on which Lakin rests and on which the dissent appears to rely.[44]
We note one final ground on which Lakin’s holding may rest. Lakin concluded that Article I, section 17, means the same thing today that it meant in 1857, and Lakiris holding may rest on the ground that only those legal limitations on damages that existed in 1857 are constitutionally valid. To the extent that is the ground on which Lakin rests, it is at odds with this court’s cases. As this court explained in Fazzolari, the limits on the extent of a defendant’s damages that the common law recognized in 1857 bear little resemblance to those that we recognize today. See id. at 4-10 (discussing the growth of the common law). As Justice Linde observed in Fazzolari:
“At the time the Oregon Territory adopted the ‘common law of England,’ the common law had no broad theory of liability for unintended harm resulting from a failure to take due care toward members of the public generally but only liability for harm resulting from negligent conduct in various callings and relationships. Men had particular duties but no general duty.”
Id. at 4 (footnote omitted). Over time, the scope of a defendant’s liability has expanded, as well as the extent of the damages for which a negligent defendant may be held responsible. See id. at 4-10. The court accordingly held in Fazzolari that, unless “a status, a relationship, or a particular standard of conduct *** creates, defines, or limits the defendant’s duty,” a defendant is generally liable for the foreseeable consequences of his or her negligence. Id. at 17; see also Chapman v. Mayfield, 358 Or 196, 205, 361 P3d 566 (2015) (discussing expanding scope of liability for negligence).
*247 The state constitutional right to a civil jury trial applies equally to plaintiffs and defendants. If Article I, section 17, froze the legal limits on liability as they existed in 1857 and thus defined the extent of the damages that can be recovered against a negligent defendant, much of the later growth of the law of negligence would be at odds with Article I, section 17. Specifically, a defendant could invoke its right to a jury trial to argue against any expansion of damages beyond those for which it would have been liable when the Oregon Constitution was framed. Nothing in the text of Article I, section 17, its history, or our cases interpreting it suggests that the framers intended such sweeping consequences in guaranteeing the right to have a jury rather than a judge decide claims and defenses commonly heard at common law.
This court’s cases that preceded Lakin also provide no support for Lakin's holding. Lakin cited only one Oregon case—Molodyh v. Truck Insurance Exchange, 304 Or 290, 744 P2d 992 (1987)—to support its conclusion that Article I, section 17, limits the legislature’s authority to define the extent of available damages. However, Molodyh stands for a more limited proposition than the one Lakin drew from it. Molodyh holds that, when the legislature has made a factual issue part of a claim that is subject to Article I, section 17, the legislature may not assign that factual issue to any entity other than a jury.
The statute at issue in Molodyh gave one party to a fire insurance contract the right to require that disputes about the amount of an insured’s loss be decided by a panel of three appraisers. See id. at 293 (setting out the statute). When the insured in Molodyh sued the insurer for breach of contract, the insurer asserted its statutory right to have the amount of the loss (or the damages for the breach of contract) be determined by a panel of appraisers rather than the jury. Id. at 292. The insured objected on the ground that taking a factual element of the claim away from the jury violated Article I, section 17.
This court agreed with the insured. It explained that, under Article I, section 17, the insured was entitled to a jury trial on his cause of action for breach of contract *248 because the elements of that claim—including the amount of the loss—customarily would have been tried to a jury in 1857. Id. at 296-97. It also held that, having included that factual element as part of the plaintiffs claim, the legislature could not assign the determination of that factual element to any factfinder other than a jury, at least over a party’s objection. Id. at 297-98. Molodyh did not hold that the legislature may not place a legal limit on the nature or extent of the damages that the jury can find. Rather, it held that, once the legislature has made a factual element part of a claim subject to the jury trial right, only a jury may decide that factual element unless both parties give that right up. Properly understood, Molodyh does not call into question the legal limit that the legislature placed on the amount of damages that may be recovered from state employees.
Finally, we note that 22 other jurisdictions have considered this issue. Seventeen of those jurisdictions have held that a damages cap does not violate either the state or federal constitutional right to a jury trial. Specifically, Idaho, Indiana, Maryland, Massachusetts, Michigan, Nebraska, Utah, Virginia, West Virginia, and Wisconsin have upheld damages caps against state constitutional jury trial challenges.[45] Additionally, the United States Courts of Appeals for the Third, Fourth, and Sixth Circuits have upheld damages caps against Seventh Amendment challenges, and the United States Court of Appeals for the Fifth Circuit has upheld a damages cap against a state jury trial challenge.[46] In addition to those jurisdictions, the Kansas *249 Supreme Court has held that a cap on noneconomic damages does not violate the right to a jury trial as long as it does not violate that state’s remedy clause,[47] and the Maine Supreme Court considered those two provisions together in holding that a $250,000 damages cap did not violate that state’s jury trial and right to remedy clauses.[48] Finally, the Alaska Supreme Court affirmed by an equally divided court a judgment upholding a damages cap [49] On the other side of the ledger, five states have held that caps on noneconomic damages violate the right to a jury trial.[50]
By a considerable majority, the jurisdictions that have considered whether damage caps violate the right to a jury trial have held that they do not. Ultimately, however, the question is not what the majority rule is in other jurisdictions or what we would decide if we were considering this issue for the first time. Rather, the question is whether Lakin should be overruled. For the reasons explained above, Lakin *250 Lakin “cannot be fairly reconciled with other decisions of this court on the same constitutional provision.” Couey, 357 Or at 487 (noting that ground for reexamining our constitutional decisions). Not only does that conflict require resolution, but Lakin is of relatively recent vintage. And, since this court decided Lakin, we have distinguished rather than followed it with the exception of one case in which the parties did not dispute that Lakin governed.
Given those circumstances, we conclude that Lakin should be overruled. The text of Article I, section 17, its history, and our cases that preceded Lakin establish that Article I, section 17, guarantees litigants a procedural right to have a jury rather than a judge decide those common-law claims and defenses that customarily were tried to a jury when Oregon adopted its constitution in 1857, as well as those claims and defenses that are “of like nature.” However, that history does not demonstrate that Article I, section 17, imposes a substantive limit on the legislature’s authority to define the elements of a claim or the extent of damages available for a claim.
One other consideration informs our decision. As this court suggested in DeMendoza, the most obvious textual limitation on the legislature’s authority to alter or adjust a plaintiffs right to a remedy is found in the remedy clause of Article I, section 10. Perhaps a plaintiff also could argue that a damages cap violates some other provision of the state or federal constitutions that imposes a substantive limitation on legislative action. However, if a damages cap does not violate one of those provisions, it is difficult to see how the jury trial right renders a damages cap unconstitutional. Neither the text nor the history of the jury trial right suggests that it was intended to place a substantive limitation on the legislature’s authority to alter or adjust a party’s rights and remedies. We accordingly overrule the court’s decision in Lakin.
III. ARTICLE VII (AMENDED), SECTION 3
The trial court ruled that applying the tort claims limit to the jury’s verdict violates Article VII (Amended), section 3, of the Oregon Constitution. That section provides, in part:
*251 “In actions at law, where the value in controversy shall exceed $750, the right of trial by jury shall be preserved, and no fact tried by a jury shall be otherwise re-examined in any court of this state, unless the court can affirmatively say there is no evidence to support the verdict.”
Article VII (Amended), section 3, is an initiated constitutional amendment, which the voters adopted in 1910. See General Laws of Oregon 1911, pp 7-8. We interpret initiated constitutional amendments the same way that we interpret a statute; that is, we look to the text, context, and legislative history of the amendment to determine the intent of the voters. State v. Algeo, 354 Or 236, 246, 311 P3d 865 (2013) (initiated constitutional amendment); State v. Harrell/Wilson, 353 Or 247, 254-55, 297 P3d 461 (2013) (referred constitutional amendment).
We start with the text of the constitution. Section 3 begins with a prepositional phrase that describes the class of cases to which it applies: “all actions at law, where the value in controversy shall exceed $750.” Two independent clauses follow that prepositional phrase. The first independent clause provides that, in those cases, the “right of trial by jury shall be preserved.” Plaintiff does not argue that that independent clause guarantees anything beyond what Article I, section 17, guarantees; that is, she does not argue that, if the tort claims limitation does not violate Article I, section 17, it violates the first independent clause of Article VII (Amended), section 3.
Plaintiff focuses her argument instead on the second independent clause, which is qualified by a dependant clause. Those clauses provide that “no fact shall be otherwise re-examined in any court of this state, unless the court can affirmatively say that there is no evidence to support the verdict.” Although the second independent clause uses the passive voice, “the court” is the subject of the related dependent clause. Reading the second independent clause and the related dependent clause together, we conclude that both clauses are directed to the courts. They prohibit courts from reexamining the facts that a jury has found “unless the court can affirmatively say that there is no evidence to support the verdict.”
*252 When the people adopted Article VII (Amended), section 3, “reexamine” meant “[t]o examine anew,” and “examine” meant “to inspect carefully with a view to discover the real character or state of’ something. Webster’s Int’l Dictionary 1206, 519 (1907). By its terms, that constitutional provision prohibits courts from reassessing or second-guessing the facts that the jury found unless there is no evidence to support the jury’s verdict. Textually, the section places no restriction on the legislature’s ability to limit, as a matter of law, the issues before the jury or the extent of the damages available for a cause of action. Similarly, it does not limit a court’s ability to set aside a jury’s verdict that is inconsistent with the substantive law.
The same conclusion follows from the provision’s history. In 1899, this court followed the United States Supreme Court’s lead and held that a trial court could grant a motion for a new trial if the court determined that the jury’s verdict was “against the clear weight or preponderance of evidence.” Serles v. Serles, 35 Or 289, 295, 57 P 634 (1899), abrogated by Or Const, Art VII (Amended), § 3. Because the trial court in Series had held that it lacked authority to grant a new trial if there was “any evidence to support” the jury’s verdict, this court reversed the trial court’s judgment and remanded the case for the court to apply the new standard that it had announced. Id. at 290, 297. See also Multnomah Co. v. Willamette T. Co., 49 Or 204, 213, 89 P 389 (1907) (following Serles).
In 1910, the People’s Power League proposed a series of initiated measures, one of which was Article VII (Amended). See Official Voters’ Pamphlet, General Election, Nov 8, 1910, 201-02 (setting out the measure); id. at 166-77 (discussing the League’s measures). The League submitted the only argument discussing the measure. See id. at 176-77. The League’s argument did not discuss the part of section 3 on which plaintiff relies, but it explained that the proposed amendments generally were intended to shorten lengthy trials and reduce the number of retrials. See id. (discussing, among other things, a court’s authority to uphold verdicts when the mistake is technical and also the requirement that only three-fourths of the jurors must agree in civil *253 cases). Contemporary news articles did not discuss the part of section 3 on which plaintiff relies, while a law journal published shortly after Article VII (Amended) was adopted criticized the measure because it took away a trial court’s authority to grant a new trial when the jury’s verdict was contrary to the weight of the evidence. 77 Cent LJ 384, 388 (1913).
Although the history of Article VII (Amended), section 3, is sparse, this court has summarized its purpose succinctly: “to eliminate, as an incident of a jury trial in this state, the common law power of a trial court to re-examine the evidence and set aside a verdict because it was excessive or in any other respect opposed to the weight of the evidence.” Van Lom, 187 Or at 99. As Van Lom made clear, the part of Article VII (Amended), section 3, on which plaintiff relies was directed at a specific practice—a trial court’s decision to grant a new trial because the court concluded that the verdict was contrary to the weight of the evidence.
That practice is not present here. In applying the statutory limit on damages, the trial court was not “re-examining” a fact found by the jury, determining that the fact was contrary to the weight of the evidence, and granting a new trial for that reason. Rather, the court was applying a legal limit, expressed in the statute, to the facts that the jury had found. Article VII (Amended), section 3, does not prohibit courts from applying the law to the facts.
Plaintiffs contrary argument, as we understand it, is that the legal limit that the legislature placed on the extent of a jury’s damages award has as deleterious an effect on the exercise of her jury trial right as the pre-1910 practice of remittitur. That may be true. The Tort Claims Act limits the amount of the jury’s damages award without giving a plaintiff the option of a new trial. However, the text of Article VII (Amended), section 3, its history, and our cases interpreting it provide no basis for converting a limit on a trial court’s ability to second-guess a jury’s factual findings into a limit on the legislature’s ability to state legal principles that define the elements of a cause of action or the type or extent of the available damages. Article VII (Amended), *254 section 3, does not provide a basis for holding the damages limitation stated in the Tort Claims Act unconstitutional. Again, any constitutional limitation must find its source in some other provision of the state or federal constitution.
We conclude that applying the Tort Claims Act limit to plaintiffs claim against defendant does not violate the remedy clause in Article I, section 10, nor does giving effect to that limit violate the jury trial clauses in Article I, section 17, or Article VII (Amended), section 3. We accordingly reverse the trial court’s limited judgment and remand this case to the trial court for entry of a judgment consistent with this decision.
The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.

 The trial court’s limited judgment arises from its ruling on the Tort Claims Act limitation but does not encompass its other rulings regarding plaintiffs’ claims. See Horton v. OHSU, 277 Or App 821, 373 P3d 1158 (2016) (addressing plaintiffs’ appeal from other trial court rulings).

 The Tort Claims Act imposes a different monetary limit on tort claims against a local public body and its employees. OBS 30.272.

 As discussed below, Article I, section 10, contains three independent clauses. The parties’ arguments focus on the third of those clauses, the remedy clause. That clause provides that “every man shall have remedy by due course of law for injury done him in his person, property, or reputation.” Or Const. Art I, §10.

 The issue in Deiz was whether closing a juvenile adjudication to the public violated the open courts clause of Article I, section 10. 289 Or at 279. In distinguishing Article I, section 10, from other provisions in the Oregon Constitution, Justice Linde did not limit his discussion to the open courts clause of that section but wrote more broadly.

 Article I, section 10, consists of three independent clauses (“No court shall,” “justice shall be administered,” and “every man shall have”), which are joined by two conjunctions. Although Smothers stated that Article I, section 10, consists of two independent clauses, 332 Or at 91, Smothers may not have been using the phrase “independent clause” in its grammatical sense.

 In Eastman, the court explained that the county’s common-law immunity derived from Russell v. Devon Co., 2 Term R 667 (1788), which had held that an unincorporated county was immune from liability for its negligence, primarily to avoid the prospect of a judgment “be[ing] satisfied out of the property of any one of the men of Devon, [with] the result [that there] would be ‘an infinity of actions’ among the defendants for contribution.” Eastman, 32 F at 28-29.

 Of course, even if the federal district court’s interpretation of state law had been part of its holding, a federal court’s interpretation of state law would not bind a state court faced with the same question.

 Smothers stated that Theiler v. Tillamook County, 75 Or 214, 146 P 828 (1915), had adopted the dicta in Eastman. 332 Or at 122. Smothers misperceived what Theiler held. In Theiler, the construction of a county highway caused a creek to change its course and, as a result, periodically “flofw] over and upon the plaintiff’s premises, destroying the trees, shrubs, and grass growing thereon, and washing away the soil.” 75 Or at 215. In deciding whether the landowner could bring a claim against the county, Theiler quoted the dicta from Eastman and also discussed the holdings in Templeton and two other state supreme court cases. Id. at 217-18. This court then held that the plaintiff could sue the county, a holding that rested on the court’s conclusion that causing water to invade the plaintiffs land “practically amount [ed] to a taking of *** part of the premises without condemnation.” Id. at 218. Government liability for taking property follows from the state takings clause. See Or Const, Art I, § 18. Recognizing that constitutional liability is not the same thing as adopting the dicta in Eastman.

 Because we overrule Smothers, it follows that its conclusion'—that the workers’ compensation statute was unconstitutional as applied—cannot stand. We express no opinion on whether our remedy clause cases that preceded Smothers, which we reaffirm today, would lead to the same conclusion.

 That distinction did not derive from the nature of the governmental activity. It was the same for both counties and cities—maintaining their streets in good repair. Rather, the distinction derived from the proposition that cities were created by a special charter, which imposed a duty on cities to maintain their streets. Rankin, 9 Or at 256-57. The basis for holding that counties could not be sued rested variously on the lack of a corporate identity, which the English courts had identified in Russell and the federal district court had noted in Eastman, and the proposition that counties were created by general law rather than a special charter. See John F. Dillon, 2 The Law of Municipal Corporations §§ 961, 965 (3d ed 1881) (recognizing that distinction but questioning its validity).

 The quoted paragraph from Mattson combines and repeats, almost verbatim, the cited parts of Cooley’s 1868 treatise, which summarized cases deciding contract clause and due process claims.

 In Eastman, the federal district court had rejected an argument that the plaintiff had an adequate remedy because he could sue the county employees for negligence. The district court explained that pursuing a negligence claim against a county employee was like “threshing empty straw.” Eastman, 32 P at 34. The court reasoned: “If travelers and others who sustain injuries by reason of defective highways can have no remedy against any one except these officers personally, they might as well have none.” Id. As noted above, Mattson and the cases following it did not accept that reasoning.

 In reviewing those decisions, the court observed in Noonan that the cities could not and did not invoke the doctrine of sovereign immunity because the task of maintaining city streets was regarded, perhaps illogically, as a corporate rather than a governmental function. 161 Or at 221-22; see id. at 237 (describing that function as ministerial rather than governmental).

 This court considered the constitutionality of an early version of the workers’ compensation statute in Evanoff v. State Industrial Acc. Com., 78 Or 503, 154 P 106 (1915). As the court noted in Hale, Evanoff upheld the statute against an Article I, section 10, challenge because it allowed workers to opt out of coverage. See 308 Or at 522-23 (quoting law review article noting that proposition).

 Smothers disavowed all or part of five cases on the ground that they relied on Silver or on a case that itself relied on Silver. Those cases were Noonan, Josephs, Holden, Sealey, and Hale. 332 Or at 118.

 This is not to say that there are no stray threads in our remedy clause cases. See Noonan, 161 Or at 242-43 (discussing some statements in remedy clause opinions that were incorrect even while following the larger principles recognized in those decisions). However, with the exception of Smothers, the larger principles that underlie and inform our remedy clause cases can be read consistently.

 The phrase means “We will sell to no man.”

 The phrase means “in goods, in lands, or in person.”

 The clauses mean “Free, because nothing is more iniquitous than saleable justice; full, because justice ought not to limp; and speedy, because delay is in effect a denial.”

 In discussing Chapter 39 of Magna Carta, Coke explained that, even though parliament had given the king more leeway than the common law had provided to bring prosecutions, parliament had corrected its error when the harmful effect of its procedure became apparent. Coke, Second Part of the Institutes at 51. He thus recognized that parliament might depart from the common law and the principles expressed in Magna Carta but believed that parliament eventually would correct its error. See id.

 For instance, John Adams stepped forward to plead that the courts reopen, explaining, “ [i] nnumerable are the Calamities which flow from an Interruption of Justice. Necessity requires that the Doors of Justice should ever be open to hear the Complaints of the Injured and Oppressed.” See “Argument before Governor Bernard and the Council in Favor of Opening the Courts, Dec 20, 1765,” in 1 Papers of John Adams, September 1755 - October 1773 (Robert J. Taylor ed., 1977).

 At the time, the Massachusetts Constitution provided: “Every subject of the commonwealth ought to find a certain remedy, by having recourse to the laws, for all injuries or wrongs which he may receive in his person, property, or character.” Mass Const, Pt 1, Art XI.

 Among other things, the statute at issue in Stowell “cut off the traditional action for trespass to land, in which a plaintiff was not required to prove actual injury in order to recover.” Horwitz, The Transformation of American Law at 48 (footnote omitted). Moreover, the act prevented the landowner from seeking to enjoin the nuisance and self-help, both of which remedies would have been available at common law. Id.

 Then, as now, the Maine Constitution provided:
“Every person, for an injury done him in his person, reputation, property, or immunities, shall have remedy by due course of law; and right and justice shall be administered freely and without sale, completely and without denial, promptly and without delay.”
Me Const, Art I, § 19 (1820).

 At the other extreme, some jurisdictions viewed the remedy clause as directed solely at the judiciary, having no bearing on legislation. In Barkley v. Glover, 61 Ky 44 (1862), for instance, a case about a statute forbidding the issuance of judgments for debts arising within a certain period, the court expressly rejected the claim that the remedy clause applied to the legislature:
“The doctrine that the [remedy clause] applies alike to the legislative and judicial branches of government is, in our judgment, directly opposed to the meaning and language of the section. This, we think, is rendered perfectly obvious by reading it. The courts form its sole subject matter, and every part and parcel of the section relates directly to some duty of that branch of the government.”
Id. at 45-46.

 The legislature designed a two-tier approach to Tort Claims Act damage limitations. One set of limits would govern claims against local government bodies, and another set would govern claims against the state and OHSU. See Ex 1, Senate Committee on the Judiciary, SB 311, Jan 22, 2009, “Recommendations of the Oregon Tort Claims Task Force.”

 Plaintiff reasons that the holding in Hale turned on (or should be limited to) the fact that the plaintiff’s claim in that case was only against the city, and not a city employee. Cf. Mattson, 39 Or at 580 (recognizing that the legislature could immunize a city as long as the injured plaintiff had a remedy against a city employee). However, the limitation that plaintiff perceives in Hale is not found in the majority opinion. Rather, the limited reading of Hale that plaintiff and the dissent urge reflects the view of a single judge expressed in a concurring opinion in which no other judge joined. Although the court in Clarke read Hale consistently with the concurring opinion in that case, Clarke did so under the press of Smothers, which we have overruled.

 Two considerations distinguish our holding today from the holding in Clarke. The first is the size of the award, in relation to the damages awarded. The second is the quid pro quo that the Tort Claims Act provides and its accommodation of the state’s interest in sovereign immunity and the plaintiff’s right to remedy. Perhaps as a result of Smothers and its disavowal of Hale, the parties did not argue in Clarke that those considerations mattered, and this court did *225 not factor those considerations into its holding. Even if it had, we doubt highly that the “paltry fraction” that previously was available under the Tort Claims Act would have been sufficient to constitute a substantial remedy under our cases that preceded Smothers.

 Plaintiff does not provide any additional authority to support Lakin’s holding, but relies on Lakin’s discussion of the text of Article I, section 17, the history that preceded the adoption of that provision, and cases interpreting it.

 The court did not discuss Article I, section 17, in Clarke or Howell. In Clarke, the court resolved the plaintiffs claim solely on the basis of Article I, section 10, and found it unnecessary to reach his Article I, section 17, claim. 343 Or at 610 n 19. In Howell, the two questions that the Ninth Circuit certified to this court asked only about Article I, section 10. See 353 Or at 361 (setting out the certified questions). The certified questions did not ask about Article I, section 17, perhaps because the Seventh Amendment governs the right to jury trials in federal courts.

 We quote, in full, DeMendoza’s resolution of the plaintiffs Article I, section 17, claim:
“Likewise, if a ‘right’ to receive an award that reflects the jury’s determination of the amount of punitive damages exists, then it must arise from some source other than Article I, section 17. For example, in Lakin, the plaintiffs’ rights under Article I, section 17, were violated, because the cap on noneco-nomic compensatory damages interfered with the plaintiffs’ ‘right to receive an award that reflect [ed] the jury’s factual determination of the amount of the damages’ that would ‘“*** fully compensate [plaintiffs] for all loss and injury to [them].”’ 329 Or at 81 (quoting Oliver v. N.P.T. Co., 3 Or 84, 87-88 (1869)). Here, in contrast, plaintiffs have no underlying ‘right to receive an award’ that reflects the jury’s determination of the amount of punitive damages, nor are those damages necessary to ‘compensate’ plaintiffs for a ‘loss or injury [to them].’ [DeMendoza,] 334 Or at 446 (no right to punitive damages as remedy under Article I, section 10). Because plaintiffs lack that right, the legislature’s allocation of a portion of the punitive damages award to the state does not implicate Article I, section 17.”
DeMendoza, 334 Or at 447 (last bracket added; all other brackets and ellipses in DeMendoza).

 The court took a similar approach in Lawson. In that case, a statute prohibited uninsured drivers from recovering noneconomic damages arising from an automobile accident. See 339 Or at 260. The court held that that statutory condition did not violate Article I, section 10. Id. at 264-65. The court then held that, because Article I, section 17, “‘is not a source of law that creates or retains a substantive claim,’” that provision did not assist the plaintiff in the absence of an Article I, section 10, right or some other right to recover noneconomic damages. Id. at 267 (quoting Jensen, 334 Or at 422).

 Because the plaintiff in Hughes had tried her wrongful death claim to a jury, that case did not require the court to decide whether she had a procedural right under Article I, section 17, to do so because a wrongful death action was “of like nature” to a claim that would have been tried to a jury in 1857. Hughes, 344 Or at 156 n 12.

 The same tension existed in Lakin itself. On one hand, Lakin implicitly accepted Greist’s holding that Article I, section 17, did not preclude the legislature from capping noneconomic damages in wrongful death actions because actions for wrongful death did not exist in 1857. 329 Or at 77. On the other hand, Lakin stated later in the opinion that Article I, section 17, applies to “actions for which the common law provided a jury trial when the Oregon Constitution was adopted in 1857 and in cases of like nature.” Id. at 82 (emphasis added). Because a wrongful death action is “of like nature” to the tort action that underlies it, Lakin’s acceptance of Greist is at odds with its later statement of the scope of Article I, section 17.

 Although Lakin initially recognized that the term “inviolate” was not dispositive, 329 Or at 69, it later followed a Washington Supreme Court decision that gave the term greater significance, see id. at 79-80 (following Sofie v. Fibreboard Corp., 112 Wash 2d 636, 771 P2d 711 (1989)). We question how much weight can be put on that term. As the Fifth Circuit recently explained, “‘inviolability’ simply means that the jury right is protected absolutely in cases where it applies; the term does not establish what that right encompasses.” Learmouth v. Sears, Roebuck Co., 710 F3d 249 (5th Cir 2013) (interpreting Mississippi constitutional right to jury trial). Providing that the right to trial by jury shall remain “inviolate” does not differ in any material respect from providing that the right shall remain “sacred” or “preserved,” nor does the use of that term explain the scope of the guarantee.

 We say “popularly” because “[h]istorians no longer accept the Magna Charta pedigree for jury trial.” Charles W. Wolfram, The Constitutional History of the Seventh Amendment, 57 Minn L Rev 639, 653 n 44 (1973).

 Blackstone reasoned that, as to law, “partiality can have little scope the law is well known, and is the same for all ranks and degrees; it follows as a regular conclusion from the premises of fact pre-established.” Blackstone, 3 Commentaries at 380.

 The original 13 states continued the institution of jury trials “either by express provision in a state constitution, by statute, or by continuation of the practices that had applied prior to the break with England.” Wolfram, Seventh Amendment, 57 Minn L Rev at 655.

 Article III, section 2, of the United States Constitution provides, in part:
“The Trial of all Crimes, except in Cases of Impeachment, shall be by Jury; and such Trial shall be held in the State where the said Crimes shall have been committed.”

 Having acknowledged that a civil jury might affect the way in which the law was executed, Hamilton then discounted the effect that a civil jury in fact would have on the way the executive carried out the tax laws. The Federalist No. 83 at 468.

 As adopted, the Seventh Amendment provides:
“In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law.”
US Const, Amend VII.

 This case does not require us to consider the limits that Article I, section 17, places on the legislature’s ability to alter the essential procedural attributes of a jury trial, and we express no opinion on that issue.

 A relatively stark example is found in a line of New York cases limiting a defendant’s liability for a negligently set fire to the damages suffered by adjoining landowners. See, e.g., Bird v. St. Paul Fire & Marine Ins. Co., 224 NY 47, 120 NE 86 (1918) (so holding).

 One other possible distinction requires mention. By statute, a court can impose the tort claims limit only after the jury returns its verdict. See ORS 30.269(3). However, from the perspective of Article I, section 17, the degree of interference with the jury’s verdict is the same regardless of whether the jury is informed of the limit in advance of its deliberations or the limit is imposed after the jury returns its verdict.

 Kirkland v. Blaine Cnty. Med. Ctr., 134 Idaho 464, 4 P3d 1115 (2000) (cap on noneconomic damages); Johnson v. St. Vincent Hosp., Inc., 273 Ind 374, 404 NE2d 585 (1980) (capped damages with possibility of additional recovery from compensation fund), modified on other grounds by In re Stephens, 867 NE2d 148 (Ind 2007) (permissible limits on attorney fees); Murphy v. Edmonds, 325 Md 342, 601 A2d 102 (1992) (cap on noneconomic damages); English v. New England Med. Ctr., 405 Mass 423, 541 NE2d 329 (1989) (cap on medical malpractice damages); Phillips v. Mirac, Inc., 470 Mich 415, 685 NW2d 174 (2004) (cap on noneconomic damages); Gourley v. Neb. Methodist Health Sys., Inc., 265 Neb 918, 663 NW2d 43 (2003) (cap on medical malpractice damages); Judd v. Drezga, 103 P3d 135 (Utah 2004) (cap on “quality of life” damages); Etheridge v. Med. Ctr. Hosp., 237 Va 87, 376 SE2d 525 (1989) (cap on noneconomic damages); Robinson v. Charleston Area Med. Ctr., Inc., 186 W Va 720, 414 SE2d 877 (1991) (same); Maurin v. Hall, 274 Wis 28, 682 NW2d 866 (2004) (same).

 Davis v. Omitowoju, 883 F2d 1155 (3d Cir 1989) (noneconomic damages cap); Boyd v. Bulala, 877 F2d 1191 (4th Cir 1989) (same); Smith v. Botsford *249 Gen. Hosp., 419 F2d 513 (6th Cir 2005), cert den, 547 US 1111 (2006) (same); Learmonth v. Sears, Roebuck & Co., 710 F3d 249 (5th Cir 2013) (upholding damages caps against challenge based on state constitutional right to jury trial after Mississippi Supreme Court refused to accept certified question on that issue).

 In 1988, the Kansas Supreme Court explained that, under the Kansas Constitution, a damages cap will violate a party’s right to a jury trial if the cap violates the state’s remedies clause. Kansas Malpractice Victims Coal. v. Bell, 243 Kan 333, 757 P2d 251 (1988). Because the statute capping noneconomic damages in that case violated the state remedy clause for lack of a sufficient quid pro quo, the cap also violated the right to a jury trial. Id. In 2012, the court held that a different statute capping noneconomic damages in personal injury actions contained a sufficient quid pro quo to satisfy the state remedy clause and, as a consequence, held that that cap did not violate the right to a jury trial. Miller v. Johnson, 295 Kan 636, 289 P3d 1098 (2012).

 The Maine Supreme Court explained that,
“[ajlthough it is conceivable that a statute could limit the measure of tort damages so drastically that it would result in a denial of the right to trial by jury and the denial of a remedy, the $250,000 cap before us [on damages for persons injured as the result of negligently over-serving alcohol] is not such a measure.”
Peters v. Saft, 597 A2d 50, 53 (Me 1991).

 Evans ex rel. Kutch v. State, 56 P3d 1046 (Alaska 2002) (affirmed by an equally divided court).

 Moore v. Mobile Infirmary Ass’n, 592 So 2d 156 (Ala 1991) (cap on non-economic damages); Atlanta Oculoplastic Surgery, P.C. v. Nestlehutt, 286 Ga 731, 691 SE2d 218 (2010) (same); Watts v. Lester E. Cox Med. Ctr., 376 SW3d 633 (Mo 2012) (same); Knowles v. United States, 544 NW2d 183 (SD 1996) (same); Sofie v. Fibreboard Corp., 112 Wash 2d 636, 771 P2d 711 (1989) (same).